STEWART PATTERSON *et al.*

*v.*

LORENZO M. JOHNSON, Exr.

*Filed at Ottawa May 15, 1885.*

1.  TRUSTS—*acceptance of a trust—evidence thereof.*  Where a trust deed contains a provision that the trustee thereby accepts the trust, and covenants faithfully to execute the same, and the deed is signed by the trustee, and various acts of the trustee under and in recognition of the trust are shown, this will afford evidence of his acceptance of the trust, and the trust deed will take effect by such acceptance.

2.  SAME—*non-acceptance or abandonment of a trust as to the beneficiaries—of acts having such tendency.*  The failure to record a deed conveying property in trust for the benefit of the grantors and their father, for six or seven years, when a good reason appears therefor, is not evidence of any

113  559
160   75

113  559
163  348

113  559
63a 278

113  559
181  253

113  559
87a 393

113  559
187 15174

113  559
115a15463

importance to show an abandonment of the trust by the parties in interest. And giving the principal management of the property to the life beneficiary, representing two-fifths of the property owned by others, not parties to the deed, is not inconsistent with the continued existence of the trust, especially where the trustee consults with and participates to some extent with the active manager in looking after the interests represented by him.

3. The owners of three-fifths of a city lot conveyed the same to a trustee upon a certain trust, among which was the erection of a costly building upon the premises, and he was not willing to incur personal obligations in that behalf, but was induced to accept the trust under an arrangement that the trust deed should not be recorded, so as to enable the real parties in interest to obtain loans upon the property, for the furtherance of the contemplated improvement, which they did, giving their own notes, secured by their deeds of trust on the property. It was *held*, that such acts were not inconsistent with the existence of the trust, and did not prove its non-acceptance or abandonment.

4. SAME—*of a new agreement varying the provisions in a trust deed— effect upon the existence of the trust.* The owners of a three-fifths interest in certain real estate, conveyed the same in trust, for the sole benefit of their father during his life, and after his death for their own use. Subsequently, they, in conjunction with an owner of another one-fifth interest, and the trustee, entered into a written agreement giving the father the control and management of the property, for which he was to receive $300 per month out of the income, which was all he was to receive from the property: *Held*, that while such agreement varied somewhat the provisions of the trust deed, it was not inconsistent with the prior existence of the trust, or with the trusteeship after its date.

5. SAME—*of the reasonableness of a provision—as affecting the validity of a trust.* A conveyance by three daughters, aged twenty, twenty-two and twenty-seven years, respectively, of their interest in certain real property, to a trustee, for the sole use and benefit of their father, then of the age of seventy-one years, and in embarrassed financial circumstances, made of their own volition, without the solicitation of the father, will not be set aside as being an unreasonable provision for the father.

6. SAME—*powers of trustee—discretionary powers by implication.* A discretionary power may be conferred on trustees, either by express terms of the trust, or by implication, from the nature of the duty imposed on them.

7. SAME—*powers construed—as to the management of property.* Three daughters, being the owners of three-fifths of an unimproved city lot, conveyed the same to a trustee, for the use of their father for life, and remainder for their use. The deed conveyed "with full power and authority in the said B. (trustee) to sell and convey said real estate in fee simple, or to mortgage or convey the same by trust deed, or to lease the same, and out of the moneys arising therefrom," to reimburse himself, to discharge liens, and invest the

remainder, or to pay the rents to the parties; and it also provided: "Said real estate being now unimproved and unoccupied, full power and authority is hereby given the said trustee, in his discretion, to borrow money upon said property, and to rebuild the same in such manner as to him shall seem best. In case he shall advance money himself for the purpose of rebuilding said property, then he shall have a lien thereon for the full amount of such advances:" *Held,* that the trustee was not confined to leasing the property after building upon the same, but his power extended to the making of any reasonable changes in the building which would be of benefit for the leasing of it, especially where the trustee had to act in conjunction with the other two joint owners.

8. SAME—*words construed—as expressing the extent of the interest in the beneficiary.* A trust deed made for the benefit of the grantor's father, after the granting part and *habendum* clause "in trust," contained these words: "The said H. L. S. (the father) has only a life interest in said estate, the remainder belonging in fee to his said daughters:" *Held,* that such clause was but an expression of the interest the father took under the deed, and not of what his interest was prior to the making of the same.

9. REVERSIONER—*whether entitled to an accounting—as against a tenant for life or trustee.* A person having only a reversionary interest in real property, and not entitled to the income from the same during the existence of the prior life estate, has no right to call upon the trustee holding the legal title, and the life tenant, for an account of the income of the property, but is entitled to an accounting only so far as it bears upon the allowance of debts claimed to be a charge against the property, and which may affect his reversionary interest in the same.

10. TAXES—*liability of life tenant.* Where property is conveyed to a trustee in trust, for the use and benefit of A. during his life, with remainder in trust for the grantors, and the buildings thereon are destroyed by fire, so that for several years it yields no income, the life tenant will not be bound to pay the taxes on the same during the years it remains unproductive, and the trustee paying the same may properly have them charged upon the property.

11. GUARDIAN AND WARD—*how far the latter bound by the action of the former.* On a bill for an accounting, in respect to the income of real property and charges and disbursements, filed by a minor, by his guardian and next friend, the cause was referred to the master to take evidence and state the account. On the hearing before the master, the minor was represented by his guardian in person, as well as by his solicitor, and the parties then filed a written statement of certain items in the accounts presented which they desired to dispute, and the evidence taken was in support or denial of these items: *Held,* that the minor was bound by the action of his guardian and solicitor in making up the issues on the accounts.

12. ESTOPPEL—*by recitals in deed.* The grantee in a deed poll, with covenants of warranty, is not estopped to deny his grantor's title.

36—113 ILL.

13. So where real estate had been conveyed to a party on certain trusts to be executed by him, the grantor conveyed the same property to another by trust deed, to secure a note in favor of his first grantee or trustee, it was *held,* that the latter was not estopped by the recitals and covenants in the second deed from claiming to act as trustee for the beneficiaries in the trust deed to him.

14. VOLUNTARY CONVEYANCE—*want of power of revocation, as affecting the validity of the deed.* The absence of a power of revocation is not of itself ground for setting aside a voluntary conveyance. It is no more than a circumstance to be considered upon that question, in connection with all the other facts appearing in the case.

15. CHANCERY — *accounting — requiring written statement of disputed items.* Where a cause is referred to a master to state an account between the parties in interest, of the income and rentals of property, and of the taxes, interest paid, and other disbursements, and the accounts of the parties are filed before him, the settled practice will warrant the master in having a written statement made of any disputed items of the accounts, and making them the basis of the evidence taken before him.

16. SAME—*time for making objection or disputing items.* Where parties appear before the master, to whom a cause is referred to state an account, and there file objections to such items in the accounts presented, as they desire, and the master hears evidence as to such disputed items and prepares his report, they can not, on objection to the draft of the report, dispute for the first time other items in the account.

WRIT OF ERROR to the Circuit Court of Cook county; the Hon. W. H. BARNUM, Judge, presiding.

Mr. JOHN WOODBRIDGE, for the plaintiffs in error:

The trust deed to Pullman was never accepted by him, and if it was, the subsequent acts of the parties were inconsistent with the existence of the attempted trust. It was void upon its face, when construed with reference to the relations of the parties.

The gift to the father could only be sustained upon the following conditions: First, that the daughters fully understood the condition of the title; second, that the father concealed no facts within his knowledge; third, that he did not exercise undue influence to procure the gift; fourth, that on the part of the donors it was not only an intelligent but a

free-will offering; fifth, that it was reasonable, with a view to the circumstances of the parties; and sixth, that the donors should not rely on the attorney of their father, but should consult their own.

The gift was void, because the daughters had no competent independent legal advice. *Rhodes* v. *Bates*, 1 L. R. Ch. App. 252; *Prideaux* v. *Lonsdale*, 1 DeG., J. & S. 433; *Garnsey* v. *Munday*, 24 N. J. Eq. 243; *Russell's Appeal*, 75 Pa. St. 269; *Huguenin* v. *Baseley*, 3 L. C. in Eq. 108; *Cook* v. *Lamotte*, 15 Beav. 234; *Phillipson* v. *King*, 32 id. 628; *Wollaston* v. *Tribe*, L. R. 9 Eq. 44; *Coalts* v. *Acworth*, L. R. 8 Eq. 558.

The same is invalid for want of a power of revocation. *Wollaston* v. *Tribe*, L. R. 9 Eq. 44; *Coalts* v. *Acworth*, L. R. 8 Eq. 558.

The false recital in the deed that General Stewart had a life estate, is sufficient ground for setting it aside. *Llewellin* v. *Cobbold*, 1 Sm. & Gif. 380.

If the deed was in fact delivered to Pullman, which is denied, Mrs. Patterson had a right to rescind by any appropriate action. Her series of deeds, and those of her sisters, for the use of Pullman and others, affords unequivocal evidence of her intention to rescind. *Green* v. *Kent*, 13 Mass. 518; *Shufeldt* v. *Shufeldt*, 9 Paige, 137; *Spengler* v. *Snapp*, 5 Leigh, 478; *Ferris* v. *Crawford*, 2 Denio, 595; *Dix* v. *Van Wyck*, 2 Hill, 522; *Post* v. *Dart*, 8 Paige, 639; *Powlasky* v. *Miller*, 1 Stockt. 807; *Daub* v. *Barnes*, 1 Md. Ch. 127; *Green* v. *Tyler*, 39 Pa. 361; *Newman* v. *Kershaw*, 10 Wis. 333; *Maher* v. *Lanfrom*, 86 Ill. 521.

A trust may be repudiated without an express disclaimer, as, by evidence of the conduct of the party amounting to a refusal of the office; and a disclaimer may be presumed after long neglect to qualify, or refusal to act. 1 Perry on Trusts, sec. 270; *Stacey* v. *Elph*, 1 M. & K. 000; *Ayres* v. *Weed*, 16 Conn. 291; *Thornton* v. *Winston*, 4 Leigh, 152; *Wardwell* v. *McDonell*, 31 Ill. 364; *Williams* v. *King*, 43 Conn. 572.

Messrs. Mason Brothers, for the plaintiff in error Stewart Patterson:

As against an infant, everything must be proved. The guardian can admit nothing. *Cochran* v. *McDowell*, 15 Ill. 10; *Hill* v. *Ormsbee*, 12 id. 166; *Quigley* v. *Roberts*, 44 id. 503; *Gooch* v. *Green*, 102 id. 507.

It is the duty of the life tenant to pay the taxes. He can not charge the reversion with them. *Prettyman* v. *Walton*, 34 Ill. 175; *Waldo* v. *Cummings*, 45 id. 421; *Estate of Miller*, 1 Tucker, 346.

The same rules of law apply, whether the estate be a legal or equitable one. 2 Story's Eq. Jur. sec. 974; 1 Mad. Ch. 360; *Fisher* v. *Field*, 10 Johns. 494; Perry on Trusts, secs. 321, 357.

It is held to be the duty of the trustee, if in possession, to pay the taxes, although taxes were not mentioned in the deed creating the trust, (*Burr* v. *McEwen*, Baldwin, (U. S. Cir. Ct.) 154,) and if not in possession, to see that the equitable tenant for life does so. *Fountain* v. *Pellet*, 1 Ves. Jr. 342; *Tupper* v. *Fuller*, 7 Rich. Eq. 170; *Jones* v. *Dawson*, 19 Ala. 692.

The law also requires tenants for life to pay interest on incumbrances. *Moseley* v. *Marshall*, 27 Barb. 42; *Warley* v. *Warley*, 1 Bailey's Eq. 397; *Swain* v. *Perine*, 5 Johns. Ch. 482; *Saville* v. *Saville*, 2 Atk. 463. See, also, for a statement of the legal principle: 1 Washburn on Real Prop. 96; 1 Story's Eq. Jur. secs. 486, 488; 4 Kent's Com. 74; Perry on Trusts, sec. 554. See, also, *Bond* v. *Lockwood*, 33 Ill. 212.

A tenant for life can not lay out moneys in building or improvements on the estate, and charge it to the inheritance. The court of chancery will not sustain an inquiry whether the improvements are beneficial. The tenant makes them at his own hazard. 4 Kent's Com. (12th ed.) *76, note b; *Caldcott* v. *Brown*, 2 Hansch. *144; *Floyer* v. *Bankes*, L. R. 8 Eq. 115; Williams on Real Prop. 30, 32.

The beneficiary under the trust deed took a vested interest, and the trustee could not release or change it. *McDonald* v. *Starkey*, 42 Ill. 442.

In the following case the maker of a trust was not allowed to change it by his subsequent last will and testament. The court say: "An executed trust will be sustained and enforced in all its provisions." *Padfield* v. *Padfield*, 72 Ill. 323; *Nicoll* v. *Ogden*, 29 id. 332; *Nicoll* v. *Miller*, 37 id. 387; *Nicoll* v. *Mason*, 49 id. 358.

A trustee is bound to perform his trust, whether he receives a salary or not. (*Switzer* v. *Skiles*, 3 Gilm. 529; *Cooper* v. *McClun*, 16 id. 435.) Therefore the agreement of January 1, 1878, so far as it assumes to change the minor's rights under the Pullman trust, is invalid.

Mr. JAMES B. GALLOWAY, guardian, also for Stewart Patterson.

Messrs. DEXTER, HERRICK & ALLEN, for the defendant in error:

The law presumes that every gift, whether in trust or not, is accepted, until the contrary is proved. Perry on Trusts, sec. 259; Hill on Trustees, 334; *Bryant* v. *Walsh*, 2 Gilm. 568.

Perry says: "If the trust is created by deed, the most obvious, natural and effectual mode of signifying the acceptance is by signing the deed." Perry on Trusts, sec. 260; Lewin on Trusts, 184; *Viney* v. *Abbott*, 120 Mass. 300.

A trustee can not limit his acceptance. If he acts at all, he will be held to have accepted the entire trust. Perry on Trusts, secs. 264, 401; Hill on Trustees, 344.

It is well settled that even where, by mutual agreement, there has been a subsequent destruction or surrender of the deed with the intention of re-vesting the title, the title will not re-vest in the grantor. *Parker* v. *Kane*, 4 Wis. 1; *Cramer*

v. *Porter*, 41 Cal. 462; *Kimball* v. *Greig*, 47 Ala. 230; *Jackson* v. *Anderson*, 4 Wend. 474; *Botsford* v. *Morehead*, 4 Conn. 50; *Gilbert* v. *Bulkeley*, 5 id. 262; *Raynor* v. *Wilson*, 6 Hill, 464; *Tibeau* v. *Tibeau*, 19 Mo. 78; *Morgan* v. *Elam*, 4 Yerg. 411.

This doctrine was expressly held by this court in *Duncan* v. *Wickliffe*, 4 Scam. 42, and *Wilson* v. *Wood*, 27 Ill. 199.

This court has carried the doctrine so far as to hold that where an active trust has once been created, even though all the purposes of the trust have been subsequently fulfilled, and no further duties remain to be performed by the trustee, nothing short of a reconveyance can place the title back in the grantor. *Kirkland* v. *Cox*, 94 Ill. 414; *Vallette* v. *Bennett*, 69 id. 836.

Parol proof to show a release of a trust is not admissible. *Armstrong* v. *Merrill*, 14 Wall. 120.

The want of a power of revocation in a voluntary settlement, or the want of advice as to the insertion of such power, will not afford a ground for setting aside the settlement. *Finucan* v. *Kendig*, 109 Ill. 198.

A party, by accepting a deed with covenants of warranty, is not estopped from disputing the grantor's title. *Owens* v. *Robbins*, 19 Ill. 545; *Becker* v. *Quigg*, 54 id. 390; *Sparrow* v. *Kingman*, 1 Comst. 242; *Averill* v. *Wilson*, 4 Barb. 180; *Finn* v. *Sleight*, 8 id. 401; *Coakley* v. *Perry*, 3 Ohio St. 344; *Osborne* v. *Tunis*, 1 Dutch. 633; *Edmondson* v. *Montague*, 14 Ala. 570; *Croxall* v. *Sherard*, 5 Wall. 268.

Mr. JUSTICE SHELDON delivered the opinion of the Court:

This was a bill in equity, filed by Stewart Patterson, a minor, by James B. Galloway, guardian of his estate and his next friend, in the circuit court of Cook county, September 5, 1878, making Hart L. Stewart, George M. Pullman, Hannah M. Williams, Helen W. Johnson, Stewart Clark, Frances V. Matthews and John C. Patterson, defendants. The bill alleges that just before October 25, 1871, the premises described in

the bill, being the real estate situated on the north-west corner of Washington and State streets, in the city of Chicago,—ninety-two and a half feet on State, and ninety-five feet on Washington street,—were owned in fee simple by Jeanie Stewart, (afterwards Patterson,) Hannah M. Stewart, (now Williams,) Helen W. Stewart, (now Johnson,) Frances V. Matthews, and Hart L. Stewart, trustee for Stewart Clark, as tenants in common; that on said 25th of October said Hart L. Stewart, Jeanie, Hannah M. and Helen W. Stewart executed and delivered to George M. Pullman their deed, which was subsequently recorded on February 15, 1878, conveying all the grantors' interest in said property to George M. Pullman, as trustee, in trust for the sole use and benefit of said Hart L. Stewart during his life, and after his death for the use of the other makers, daughters of said Hart L.; that Pullman accepted the trust; that on January 6, 1875, Jeanie Stewart (then Patterson,) died intestate, leaving her surviving John C. Patterson, her husband, and orator, her only heir at law, the latter being at the time of filing the bill about three and a half years old. The bill was for an enforcement of the provisions of the deed of trust, and for an accounting. The defendants answered, all excepting John C. Patterson expressing entire satisfaction with the management of the trust, and denying the right to an account. John C. Patterson denied the validity of the deed of trust, and set up a claim in himself of a tenancy by the curtesy in the estate of his deceased wife, Jeanie Patterson. He also filed a cross-bill, setting up the same, and attacking the validity of the deed of trust. The court, on hearing, dismissed the cross-bill of John C. Patterson, and granted relief, to some extent, on the original bill. The plaintiffs in the original and cross-bills bring this writ of error.

In respect of the cross-bill, the case under which will be first considered, it is contended that the trust was not accepted by Pullman, and therefore the title did not vest in him, or if

the trust was accepted, that after the deed of trust was made it was in fact abandoned by all parties to it. The trust deed contains this provision: "The said trustee hereby accepts the trust above created, and covenants faithfully to execute the same," and shows the signature of the trustee to the deed. Where the trust is created by deed, the most effectual mode of signifying the acceptance of the trust by the trustee is by his signing the deed. (Hill on Trustees, 214; Perry on Trusts, sec. 260.) Further, Mr. Pullman testifies: "I accepted the trust by signing my name to the deed and taking possession of the deed. After I accepted the trust, the deed was put in my safe, in the vault of the Pullman company, and was kept among my private papers." Various acts were, from time to time, done by Mr. Pullman under and in recognition of the trust, though the main management of the property, until in 1878, was by Hart L. Stewart. In opposition to all the evidence of the acceptance of the trust, there is set up certain acts of the parties, and writings, which, it is claimed, are so inconsistent with the fact of acceptance as to overcome all the evidence in that regard. The neglect to record the trust deed until February 15, 1878,—more than six years,—which is spoken of, is evidently of itself of minor importance, and especially where, as here, a purpose consistent with the trust is shown for keeping the deed from record.

The trustee's alleged inaction in the business of the management of the property is relied upon. At the time of the fire of October 8 and 9, 1871, the building upon the property was burned. Up to that time Hart L. Stewart had had exclusive management of the property,—building, rebuilding, collecting the rents, etc.,—by the consent of the owners of all the five interests in the property. After the date of the trust deed there was a three-fifths interest in the trustee. Hart L. Stewart was the trustee of a one-fifth interest belonging to Stewart Clark, the agent of another one-fifth interest belonging to Frances V. Matthews, and he had himself the

interest of a life tenant in the three-fifths conveyed to the trustee, and was the father and grand-father of the owners. This condition of things would suggest the propriety of one common manager for all the five interests, and the fitness of Hart L. Stewart as such manager, and he appears to have had the substantial management of the property, but yet with enough of consultation with and coöperation on the part of Mr. Pullman to indicate that the trust was all the while subsisting in the latter.

As mentioned, the deed of trust was not recorded until in 1878, and there is an exhibition of a formidable array of writings made before that time, consisting of a petition of Hart L. Stewart to the county court for leave to mortgage the one-fifth interest of Stewart Clark, trust deeds made of the property to secure sums of money, policies of insurance on the property, a power of attorney to Hart L. Stewart to execute leases and collect rents, leases made thereunder, and other writings of and between the parties beneficially entitled, in all which the parties holding the title of record are declared to be the present owners of the property.

The property was rebuilt, and a loan of $125,000 for the purpose was obtained upon the security of the property. The deed of trust to Pullman authorized this, but there was no mention of his title or name in connection with the loan. The written application for the loan by Hart L. Stewart stated the title to be in the heirs of Hannah B. Stewart, his deceased wife, naming them. The abstract of title exhibited showed the record title to be in them, and the trust deed on the property to secure the loan was executed by them, alone. The explanation for this, and with respect to all the other writings, is, that Mr. Pullman made the objection to accepting the trust that it might become necessary for him to sign notes and mortgages for the loan, and the attorney who drew the deed of trust suggested to him that that necessity might be avoided by the owners themselves signing the papers and borrowing

the money, and Mr. Pullman testified his recollection was that the attorney stated the trust deed need not be put on record, and that he would be in that way relieved of the necessity of signing the notes and obligations. With this explanation, we think it may be said, in general, of all these various writings, without going into them in detail, that they are not irreconcilable with the existence of this deed of trust to Mr. Pullman, and his acceptance of the trust, but that they may well consist therewith.

The same observation may be made with respect to the position that the conduct of all the parties to the deed of trust shows an abandonment of it even if it were accepted. There is no pretence of any mutual agreement of abandonment. All the evidence relied on as showing such abandonment is the supposed inconsistent writings and acts of the parties which we have referred to.

In respect of one trust deed, (that made by Jeanie Patterson, and her husband, and the other holders of the title of record, on January 7, 1874, conveying this property to Henry S. Monroe, in trust, to secure a note in favor of George M. Pullman,) it is insisted that as that deed contained full covenants on the part of the grantors, of seizin, freedom from incumbrances, and general warranty, Pullman is estopped thereby from claiming under the deed of trust of October 25, 1871. The deed was not signed by Pullman, and the rule of law is, that the grantee in a deed poll, with covenants of warranty, is not estopped to deny his grantor's title. (*Owen v. Robbins*, 19 Ill. 545; *Sparrow v. Kingman*, 1 Comst. 242; *Kingman v. Sparrow*, 12 Barb. 201; *Great Falls Co. v. Worster*, 15 N. H. 450; *Gardner v. Greene*, 5 R. I. 104; *Coakley v. Perry*, 3 Ohio St. 344.) There are here no elements of an estoppel *in pais*, by the acceptance of the deed. The same may be said in regard to the effect of the trust deeds to Henry S. Monroe, for the use of Hart L. Stewart, of January, 1874, and November, 1874, on the rights of Hart L. Stewart.

Much stress is laid upon the agreement of January 1, 1878, as showing that the trust deed was not in force before that · time, but only thereafter, and that the execution of that agreement was made the condition of the recording of the deed of trust, and of Pullman's acceptance of the trust. That agreement was made between Pullman and all the parties having any interest in the property, except the minor complainant in the original bill. The agreement describes the trust deed, and makes reference to it for its terms and provisions, and names that it is to be recorded on or before March, following. The parties release each other from all claims growing out of the past control and management of the property, and agree that Hart L. Stewart shall, from that date during his life, control and manage the property, for $300 per month, to be paid out of the income, which should be all that he should receive from the property. The agreement varies somewhat from the provisions of the trust deed, but we do not perceive that it is inconsistent with the trust deed, having been in force from its date, (October 25, 1871,) and with the trusteeship of Pullman since that time. The agreement, too, approves the existing indebtedness of the property, and makes provision for its future joint management, as a whole, by Hart L. Stewart and George M. Pullman.

It is insisted that by reason of the relations between the grantors and the beneficiary of the life estate, (Hart L. Stewart,) and under the principles governing voluntary conveyances, the deed of trust was void. It is said the deed was wholly unreasonable, in view of the circumstances of the parties. The occasion of the making of the deed is thus detailed in the answer of Hannah M. Williams and Helen W. Johnson, the two surviving grantors: "That they and the said Jeanie, the mother of orator, always, up to the date of the deed to George M. Pullman, regarded said property as, in equity and morals, justly belonging to Hart L. Stewart, their father, and felt that he had the sole right to the rents, issues

and profits of the same, and the right to control and manage the same; that after the fire of October, 1871, knowing their father, Hart L. Stewart, was in feeble health, and that said property had been bought and paid for by him, and that he had, in the purchase and building up of said property, used a very large part of his own means, and feeling that under any and all circumstances their father ought, in justice, to have sufficient out of said property or its avails to insure his support during his life, they consulted with their friend and attorney, Henry S. Monroe, as to the best means of securing to their father such support, and that he advised them to deed their interest in said property so as to secure their desire; that they and the said Jeanie then applied to said Pullman, their friend, and relative by marriage, and desired him to accept the said trust, said Jeanie being the most active in her desire; that said Pullman at first declined to accept, but finally was induced so to do." The evidence accords with this answer. At the date of the deed to Pullman, Jeanie Stewart was nearly twenty-seven years old. Her sisters, Hannah and Helen, were, respectively, twenty-two and twenty years of age. The father, Hart L. Stewart, was seventy-one years old. The record shows that there was no influence whatever used by the father to procure the deed, and that it was made by the daughters of their own volition. The making of the deed was a graceful tribute of filial affection.

It is insisted the daughters did not understand the condition of the title at the time they made the deed. This is based on the following language in the deed: "The said Hart L. Stewart has only a life interest in said real estate, the remainder belonging in fee to his said daughters." It is a wrongful assumption, in our view, that this is a recital as to the state of the title prior to the making of the deed. The language occurs after the granting part of the deed, and after the *habendum* clause, "in trust," etc., and is in that part of the deed which defines the trust, and was inserted, as we un-

derstand it, to make clear the purpose that Hart L. Stewart should have only a life interest, and that the remainder belonged to his daughters,—that it was an expression of the interest which he took under the deed, and not of what was his interest prior to the making of the deed.

It is said the daughters were in error as to their father's financial condition. Notwithstanding the particulars of evidence which are relied on to the contrary, we think the whole testimony shows that the father was in embarrassed financial circumstances at the time.

It is said the deed contains no power of revocation, and should for that reason be set aside. The absence of a power of revocation is not, of itself, ground for setting aside a voluntary conveyance. It is no more than a circumstance to be considered upon that question, in connection with all the other facts appearing in any particular case. *Finucan* v. *Kendig,* 109 Ill. 198.

It is insisted the deed is void because the daughters had no independent legal advice. If that be necessary, which we do not admit, it sufficiently appears here that there was such advice. The evidence shows that before the deed was made Mrs. Patterson advised with her friend, George M. Pullman, with Mr. Tewkesbury, whose wife was an intimate friend of Mrs. Patterson, (Mr. Tewkesbury being an attorney,) and with Mr. Monroe, who drew the trust deed, and he being an intimate friend of the family. Although it appears that he had been for many years Hart L. Stewart's legal adviser, the evidence shows that the daughters, of their own motion, consulted him for themselves, and that Hart L. Stewart had nothing to do with employing Mr. Monroe to draw the trust deed, or made any suggestion in regard to it. The cross-bill alleges that the attorney who drafted the deed received his instructions from the daughters.

Certain powers given by the trust deed are pointed out as being so unreasonable, and of such dangerous character to the

interests of the grantors, as to require that the deed should be set aside. Although one or more of the provisions, literally taken, might be capable of abuse and of producing wrong, yet under the reasonable construction which should be given them, we can not view them as being obnoxious to the extent which is claimed. We perceive no error in the dismissing of the cross-bill.

We come now to the consideration of the case of the original bill. Much of what it claimed has been abandoned by complainant, or otherwise taken out of the case since the bill was filed.

The original bill alleged that complainant was entitled, under the trust deed, to a present interest in the income,— one-fifth of the annual net income. The decree found this claim not to be sustained, and this finding does not appear to be, and could not well be, urged as a ground of reversal. The bill alleges that taxes had been permitted to remain long due and unpaid upon the property, and that unpaid interest had accumulated on the indebtedness upon the property to a large amount, and prays that Pullman be directed to pay off all said taxes and accrued interest. The record shows that all these taxes and unpaid interest were paid off before the final hearing. The original bill alleges that the defendant Pullman is accountable for the alleged waste and misman-agement of Hart L. Stewart, and prays for his removal as trustee. This relief was denied by the decree, and no point is made on that ruling. The matters now in controversy, as we regard, are: First, the accounting; second, the indebt-edness of the property allowed by the decree; and third, the validity of the agreement of January 1, 1878.

The order for an accounting was entered December 30, 1879. At that time the cross-complainant claimed an ac-counting of all receipts on the ground that the trust deed was invalid, and the original complainant claimed such an accounting on the ground that he was entitled to a present

interest in the income. This order referred the cause to the master,—first, "for the purpose of ascertaining all legal liens and incumbrances existing against the property on October 25, 1871;" and second, taking an account, from that date down to the date of the decree, of all rents, profits, loans, claims, income, receipts and disbursements, of, from and concerning the property. A second order of reference was entered November 23, 1880, directing the accounting to be brought down to the date when the master made his report, and that the defendants file with the account a statement of the liabilities of the property at the date of the order. Under these orders defendants filed detailed accounts, in writing, showing the several items of receipts and expenditures; also, a statement of the liens and incumbrances on October 25, 1871, and a statement of the liabilities of the property on December 17, 1880. The master's report states that at the suggestion of the master the complainant's solicitors, and cross-complainant, filed in the master's office, for the purpose of narrowing the issues in the account, a written classified statement of disputed items; that this statement of disputed items was the basis of the evidence formally taken before the master, and that the evidence given by the respective parties was in support or in denial of the disputed items in this statement not otherwise admitted. A third order for an accounting, from December 17, 1880, to April 1, 1881, was entered, and this account was also filed with the master, and the master subsequently filed his report, dated April 1, 1881. The master returned into court the defendants' accounts, the complainant's lists of disputed items, and the master's evidence taken on those items. On October 1, 1881, a decree was entered dismissing the cross-bill for want of equity, and on June 12, 1882, a final decree was entered on the original bill, finding that the trust deed created a life estate in Hart L. Stewart, for his own sole use during his life, the interests of the other grantors in the trust deed being only reversionary

upon said life estate. Having found that the complainant had no present interest in the income, the court decreed as to the accounting, that defendants' accounts are approved and allowed as to all items in said accounts, except "the disputed items," which are specifically enumerated in the decree. It finds the total of undisputed receipts, and of undisputed disbursements, and the net income from the property. "That it is not necessary to the final determination of this suit to adjudicate upon the several disputed items in said accounts." And the decree finds the amount of the indebtedness of the property, specifying the items. The complainant contends that the court erred in not settling the items in the defendants' accounts which were disputed by complainant, and not stating the account and striking a balance, and in allowing the several claims of indebtedness of the property, except the $125,000 due Mrs. Green.

As the complainant had no interest in the income, he had no right to an account of the income, and any accounting would only be material as it had bearing upon the allowance of the indebtedness claimed to be a proper charge against the property. If the court, on the evidence before it, could determine as to that indebtedness, there would not seem to be occasion to proceed and determine upon the large number of disputed items, and settle the account. What could be the use in so doing? The complainant had no interest in the income from the property; there could be nothing coming to him; there could be no decree in his favor, except for costs; his only interest was as reversioner in the *corpus* of the property, and thus he was only concerned in the allowance of the indebtedness of the property, which question we do not see that the settlement and adjustment of the disputed items in the account would affect.

The first of the items of indebtedness of the property allowed by the decree, is the Green loan, amounting to $125,000. This was a loan obtained for the rebuilding of the property,

and the correctness of this item is not disputed. The remaining items of said indebtedness consist of advances made by Pullman, the trustee, and Hart L. Stewart,—three by the former, ($3621, $3000 and $13,000,) and one ($3621.29) by the latter. The $3621.29 was advanced in 1883, to pay taxes which were liens on the property at the date of the trust deed,—October 25, 1871. The property was not rebuilt, and yielded no income, until November, 1873, and there can be no claim that the life tenant was bound to pay those taxes, and they were a proper indebtedness of the property. The $3000 was advanced by Pullman to pay a loan made by the Union National Bank to the property, for the payment of taxes. The $13,000 is the balance of $23,000 advanced by Pullman under the following circumstances: Prior to 1878 the building had been finished off as a hotel, and was occupied as such by one Strong, under a lease running for a term of years. Some time in 1878 the adult parties in interest, including Pullman, found that owing to recent changes of business in the locality, a largely increased rental could be obtained by changing the upper floors into large rooms, to be rented for mercantile purposes, and decided that it was for the benefit of the property to make the change. In order thereto, it was necessary to buy out the Strong lease, which was done by the payment of $4008.73. The change was made, resulting. in an immediate advance of the rental of $10,300 a year,—the upper floors previously paying a rental of only from $200 to $300 per month. The cost of making this change, including the $4008.73 paid to Strong, was $14,-435.71. The items making up this amount were included in defendants' account, and were not disputed by complainant, except the payment to Strong. Prior to this change, Hart L. Stewart had consented, by agreement of January 1, 1878, to accept the sum of $3600 per annum from the entire property, as compensation for his services, and in lieu of his share of the income. In making the alterations, the parties applied

37—113 ILL.

the income in payment for them and to other indebtedness, permitting the interest on the Green loan to accumulate. On February 10, 1881, Pullman advanced $23,000, which was applied in payment of the accumulated interest on the Green loan. Prior to the date of the final decree, this indebtedness was reduced, by payments of principal and interest, to the amount then unpaid,—$13,000. This amount is less than the cost of making the change which was made. The fourth disputed item of indebtedness allowed by the decree was a balance of $3621.29, advanced by Hart L. Stewart for the payment of interest.

The objection made to the decree in the allowance of these advances is, that they were actually used in payment of taxes and interest which the life tenant was bound to pay out of the income, so that the decree charges upon the property the burden of taxes and interest upon incumbrances which it was the duty of the life tenant to pay as they accrued, and of the trustee to see that this was done; that the alteration made in the building was not a permanent improvement, and if it were, that a tenant for life can not lay out moneys in improvements on the estate and charge the same to the inheritance, although the improvements be beneficial,—citing 4 Kent's Com. (11th ed.) 81, note b, and other authorities; that the remodeling of the upper floors was a diversion of money that should have been used in paying interest, and that persons who participate in the diversion of trust funds are not allowed the pecuniary profit realized thereby, but that goes to the innocent reversioner, the law giving him a present beneficial ownership to the extent of the enhanced income caused by the diversion of the trust funds. To this it is answered, that if, on the basis of the undisputed items in the account of all receipts and disbursements, the life tenant, after being charged with the Pullman advances as actual receipts, is not indebted to the property, then it follows that these advances were properly allowed. In the account the

entire receipts, including the rentals, are charged to the life tenant. But the income did not belong to the reversioners, and in determining the amount properly chargeable to the life tenant, the net income should be deducted from the total receipts. The net income was found by the decree, as it was arrived at in the master's report, by giving a statement of the receipts from rental of each year, charging against them the taxes, insurance, repairs, and interest on the Green mortgage for that year, showing an aggregate of net income of $52,549.58. Defendants' counsel submit a calculation which, after deducting such net income from the receipts, shows an excess of undisputed expenditures over the total receipts undisputed, of $16,278.72,—a balance in the life tenant's favor of that amount. The $3621.29 advance by Hart L. Stewart, before spoken of, is the only amount he claims in lieu of the large balance thus appearing in his favor. Another calculation is submitted, which shows an excess of payments for incumbrances, permanent improvement, the alteration before mentioned, commissions on the Green loan, over the total indebtedness of the property as allowed by the decree, of $8991.41, and this without allowing the amount paid Strong for surrender of his lease. Without entering into and giving the figures, further than the result, we will say these calculations appear to us to be correct.

There is complaint by the plaintiff that the decree does not correctly declare what the disputed items in the account were. This comes from the court not recognizing as disputed items any outside of the list of disputed items which was filed. The disputed items complained of as not being recognized, appear all to have been in defendants' first account exhibited before the master, and were none of them included in complainant's list of disputed items, and are not mentioned in the master's report as among the disputed items. The first time the record shows that any question was made as to any of these items, was after the draft of the master's report was

prepared, when complainant included in his objections, which were subsequently treated as exceptions, objections to the allowance of these last items. The master reports that the list of disputed items filed with him "was made the basis of the evidence taken before the master, and that the evidence given by the respective parties was in support or denial of the disputed items in this statement not otherwise admitted." The list of disputed items formed the issues as to the items in the account, and it would not seem proper for the complainant, on objections to the draft of the master's report, to dispute for the first time these items.

It is said the statement of disputed items, and the subsequent proceedings based on them, were not binding on the complainant, he being then a minor. The course adopted by the master in having a written statement made of the disputed items, was in accordance with the well settled practice. (*Remsen* v. *Remsen,* 2 Johns. Ch. 501.) The master reports that on the hearing before him, the complainant was represented by his guardian, in person, as well as by his solicitor. We think the minor complainant was bound by their action in making up the issues on the account. We can not say the court erred in its ruling as to what the disputed items were.

It is answered to the objection that these advances were actually used in payment of taxes and interest which the life tenant was bound to pay out of the income, that it was competent for the parties, for the time being, to apply the income for other purposes, permitting the taxes and interest to accumulate, and to subsequently borrow the money to pay taxes and interest, which they might have borrowed in the first instance to make the expenditures; that the result to the reversioner is the same; that the advances were in fact made to repay to the fund which might have been applied to interest and taxes, the amount borrowed of it for other expenditures; that whether the advance should be repaid does not depend upon whether the money went to pay this or that particular

item, but on the account as a whole. We are inclined to adopt the views of defendants' counsel with respect to these advances.

We do not think the rules with regard to mere life tenants and trustees, which have been adverted to by complainant's counsel, should, in their strictness, be applied here, under the circumstances of this case. The property conveyed by the trust deed was at the time unimproved, and subject to charges and incumbrances. The trust deed gives to the trustee large discretionary powers. It conveys in trust, "with full power and authority in the said George M. Pullman to sell and convey said real estate in fee simple absolute, or to mortgage or convey the same by trust deed, or to lease the same, and out of the moneys arising therefrom," to reimburse himself, to discharge liens, and invest the remainder, or to pay the rents to the parties. It also provides : "Said real estate being now unimproved and unoccupied, full power and authority is hereby given to the said trustee in his discretion to borrow money upon said property, and to rebuild the same in such manner as to him shall seem best. In case he shall advance money, himself, for the purpose of rebuilding said property, then he shall have a lien thereon for the full amount of such advances." The property was not a sole interest, to be subject to a sole management, but it was owned in five undivided interests, of which the trust deed embraced the conveyance of but three-fifths. The other two-fifths had equal right to the possession, and equal voice in the management, and a proportional interest in the income. The trust deed contemplated a joint management, which would have to be the result of concurrent action, and we think it but the fair construction that it impliedly gave authority to do, in the management of the property, whatever was necessary to be done, to secure the coöperation of all the joint owners. The two-fifths interest was an absolute ownership, unhampered by any rule as to making improvements, or applying income, as

it accrued, to the discharge of taxes and interest; and it may have preferred, and insisted upon, the applying of income to the payment for improvements 'or other expenses, and allowing taxes and interest to remain unpaid for a time. And in support of the action of the trustee and life tenant we think it may reasonably be presumed that such was the case here, and that the method which was adopted of applying the income, and allowing taxes to remain unpaid and interest to accumulate, was demanded by the other joint owners, and was yielded to as the necessity of a joint management. The management of the property has been advantageous. No loss has resulted, but gain. There is but the suggestion that there was possibility of loss, from the liability of the mortgage to foreclosure on account of the arrears of unpaid interest. But the foreclosure of the mortgage was a thing to be desired for the interest of the property, as it appears that the money could at any time have been procured at a less rate of interest than the mortgage bore, and there had been offer to pay off the mortgage, and the offer refused.

The change which was made in the upper floors of the building,, whereby a largely increased rental was obtained, we regard not merely as a temporary change for the accommodation of a particular tenant, but think it may be viewed as a permanent improvement, and one authorized to be made under the powers given by the trust deed. The trust deed contemplated a continuous leasing of the property after the death of the life tenant. It provided for paying the rents afterwards, in equal proportions, to the daughters, but allowing to any one, after arriving at the age of thirty-five years, the right to have her interest sold. Under the broad power given, of rebuilding in the discretion of the trustee, and leasing the property continuously until any such sale, it is not to be supposed that it was the intention to confine the trustee's power in the management of the property, when rebuilt, to the mere leasing of it, but that it should extend to the making

of any reasonable change in the building which would be of benefit for the leasing of it, and especially where, as here, the management of the property was to be of it as a whole, in conjunction with the other joint owners. A discretionary power may be conferred on trustees either by express terms of the trust, or by implication, from the nature of the duty imposed on them. Hill on Trustees, 485.

It is to be noted that the several items of indebtedness allowed in the final decree as valid charges on the property, have been assented to and approved by all the parties having an interest in the property, except the minor complainant, and he having but a one-fifth interest. We can not say there was error in the allowance by the decree of these items of indebtedness.

As respects the agreement of January 1, 1878, this, as has been observed, was an agreement for a common management, signed by all the parties in interest, beneficially or otherwise, except the minor complainant. It is contended by complainant that this agreement is a departure from the Pullman trust deed of October 25, 1871, and is therefore invalid, and that the court erred in not passing upon its validity. Although the agreement is referred to in the original bill, the complainant has not alleged its invalidity in his bill, or prayed to have it set aside. The court below seems to have taken the same view of this agreement as of the disputed items of the account,— that for the determination of this suit it was not necessary to pass upon the agreement as being valid or invalid, as the bill did not ask for its being vacated. We concur with that view, perceiving no practical necessity, in the decision of this case, to determine as to the validity of that agreement. It is now still less a practical question, as since the final decree was entered, Hart L. Stewart has died, his estate being represented in this court by Lorenzo M. Johnson, executor.

The decree will be affirmed.

*Decree affirmed.*