Syllabus.

## John Oliphant *et al.*

### *v.*

### Amos Liversidge.

*Filed at Ottawa March 24, 1892.*

1. DEED—*good consideration.* Natural love and affection are a good consideration for a deed from a father to his children.

2. GIFT—*between parent and child—presumption as to fraud.* In the case of a gift from a child to a parent, undue influence may be inferred from the relation itself, but never when the gift is from the parent to the child.

3. SAME—*reasonableness, as affecting question of undue influence.* In determining the question of undue influence, a broad distinction is to be taken between a disposition by the donor which takes from him his whole estate and leaves him destitute, and one which provides for him during his life and disposes of his property in a rational mode at his death.

4. ACKNOWLEDGMENT—*impeaching certificate of acknowledgment.* In the absence of any allegation or proof of any fraud on the part of the officer taking the acknowledgment of a deed, or of any fraudulent collusion between him and any interested party, the certificate as to the statements made in it must prevail over the unsupported evidence of the grantor in the deed.

5. EVIDENCE—*of party's own statements, in absence of other party.* A party will not be allowed to make evidence by proving his own declarations in his own favor, uttered in the absence of those whose interests are sought to be affected, where they are not a part of the *res gestæ.*

6. On the hearing of a bill filed by a party to set aside a deed made by him to his children, the court allowed him to testify to conversations which he had with a real estate agent, his adviser, in the absence of either or any of the defendants, some of which occurred before the making of the deed and some after. He was also permitted to testify to conversations with his own lawyer in the absence of the defendants. The real estate agent was also allowed to testify to conversations which he had with complainant and his lawyer when none of the defendants were present: *Held,* that all of this testimony was incompetent, and should have been excluded.

7. SAME—*party's statements, when part of res gestæ.* On bill to set aside a party's deed, his declarations made to strangers in respect to the means used to procure his execution of the deed, when not contemperaneous with his act of making the deed, but in the nature of a

narrative of past occurrences, are not admissible in evidence as a part of the *res gestæ.*

8. CHANCERY — *admission of improper evidence.* A decree in chancery will not be reversed on account of the admission of incompetent evidence in the record, if there is enough of other evidence to sustain the findings of the decree, otherwise it will be reversed.

APPEAL from the Circuit Court of Cook county; the Hon. M. F. TULEY, Judge, presiding.

Messrs. MATTHEWS & DICKER, for the appellants:

The court below erred in permitting the complainant to testify to his declarations made to and conversations had with Hyde, not only some time before but also several months after he had executed the deed. Declarations, to become part of the *res gestæ,* must have been made at the time of the act done which they are supposed to characterize, and have been well calculated to unfold the nature and quality of the facts they were intended to explain, and so to harmonize with them as obviously to constitute one transaction. *Enos* v. *Tuttle,* 3 Conn. 250.

Declarations to be admissible must be contemporaneous with the act. (*Fanner* v. *Turner,* 1 Clarke, 53.) But if not consistent with the obvious character of the act, they will not control it. *State* v. *Shellidy,* 8 Clarke, 477.

These, and other quotations to the same effect, are made in 1 Greenleaf on Evidence, p. 123, sec. 108, note 2: All declarations in the nature of a narrative of past occurrences are inadmissible. Wharton on Evidence, sec. 265; *Comfort* v. *People,* 54 Ill. 406; *Black* v. *Railway Co.* 111 id. 352; *Bennett* v. *Stout,* 98 id. 47; *Higgins* v. *White,* 118 id. 619.

In the latter case (page 624) the court says: "A grantee in a deed is not affected with the declarations of the grantor made after the execution and delivery of the deed, unless, with full knowledge of such declarations, he acquiesces in or sanctions them."

11—142 ILL.

In the absence of fraud or collusion with the officer taking the acknowledgement of a deed, the certificate must prevail over the unsupported testimony of an interested party. *Canal and Dock Co.* v. *Russell,* 68 Ill. 426; *Watson* v. *Watson,* 118 id. 56; *Monroe* v. *Poorman,* 62 id. 523; *Graham* v. *Anderson,* 42 id. 514; *Lickmon* v. *Harding,* 65 id. 505; *Fitzgerald* v. *Fitzgerald,* 100 id. 385.

Although the consideration of the deed was natural love and affection, there is no presumption of fraud arising from the fact that the grantor is the father of the grantees. Bigelow in the Law of Fraud says, page 385: "In the case of a gift from a child to a parent, undue influence may be inferred from the relation itself, but never where the gift is from the parent to the child." *Beanland* v. *Bradley,* 2 S. & G. 339; *Sauffley* v. *Jackson,* 16 Tex. 579; *Millican* v. *Millican,* 24 id. 426; *Wessell* v. *Rathjohn,* 89 N. C. 377.

A disposition of his property that defrauds the donor of his estate and leaves him helpless is one thing; a disposition that provides for him during his life and rationally disposes of his property upon his death, another; and it is with reason that the courts have, in cases of undue influence, made a broad distinction between the two. *McClure* v. *Lewis,* 4 Mo. App. 554.

Mr. John C. Richberg, for the appellee.

Mr. Chief Justice Magruder delivered the opinion of the Court:

This is a bill filed on November 3, 1888, in the Circuit Court of Cook County by the appellee against the appellants Louisa Oliphant and John Oliphant, her husband, Emma H. West and William West, her husband, and Joseph Henry Liversidge, to set aside a deed of certain real estate in Chicago, executed by appellee to Mrs. Oliphant, Mrs. West and Joseph H. Liversidge, a bachelor, who are his only children.

After hearing had upon pleadings and proofs, the Circuit Court granted the prayer of the bill, and ordered the deed to be set aside and declared it to be null and void.

As the deed is short and as its length is a material circumstance, it will be set forth in full. It is as follows: "This Indenture Witnesseth that the grantor, Amos Liversidge (a widower) of the City of Chicago in the County of Cook and State of Illinois for and in consideration of the sum of Five dollars in hand paid and of natural love and affection, conveys and warrants to Louisa Oliphant, Emma Hannah West and Joseph Henry Liversidge (his only children and heirs at law) of the City of Chicago, County of Cook and State of Illinois the following described real estate, towit: Lot thirteen (13) of subdivision of the East half of Block Ten (10) of Brand's Addition to Chicago in the East half of the North East quarter ($\frac{1}{4}$) of Section Twenty (20) Township Thirty nine (39) North Range Fourteen (14) East of the Third (3d) Principal Meridian, said premises being also known as numbers $517\frac{1}{2}$ and 519 South Halsted Street situated in the City of Chicago in the county of Cook in the State of Illinois, hereby releasing and waiving all rights under and by virtue of the Homestead Exemption Laws of this State. This deed, however, is subject to an estate for life to remain in said grantor, Amos Liversidge, and in case of the marriage hereafter of said grantor, and at his death he should leave a widow him surviving, said grantees shall pay to said widow the sum of One thousand dollars. Dated this Thirteenth day of February, A. D. 1888. (Signed) Amos Liversidge."

Appellee lost his wife, the mother of the grantees above named, in 1881, and lived upon the premises above described with his daughter, Mrs. Oliphant, and her husband and children. At the time of the hearing he was sixty six years old. He received about $47.00 or $48.00 per month from the rent of said premises, and lived upon this income, not being engaged in business. The property was worth in 1888 about

$10,000.00, and was all the property which he owned except some personalty worth a few hundred dollars.   In May, 1887, he went to Europe and returned in August.   Coming over in the vessel he met a widow named Eliza Maybon, living in New York City, whom he agreed to marry.

The bill alleges, that Complainant intended to go to England in the spring of 1888 and upon his return in the summer to marry Mrs. Maybon; that the defendants formed a conspiracy to rob him of his property, and by fraud to make him convey it to his three children against his consent; that by reason of violent demands and threats made by John Oliphant, the complainant consented to make his will, and told Oliphant and his wife to tell Mrs. West to come to said premises on Monday evening February 13, 1888, and they would talk the matter over; that the defendants, except Mr. West, met him there at that time; that the provisions of the will were discussed; that complainant asked Mrs. West if she would be satisfied with the same portion as Mrs. Oliphant and Joseph would have; that Mr. Oliphant said "I have the will all made out for signing;" that complainant looked at the paper and asked how the description of the property had been obtained and was told by Oliphant that he obtained it from the records; that complainant said he thought one or two witnesses were necessary and Oliphant said it was not necessary to have witnesses; that complainant signed the paper believing it to be a will; that complainant wanted to take the will to some one to be examined, but Oliphant refused to give it up and kept it without complainant's consent; that, on February 14, Oliphant told complainant to come with him to a Notary to have him put his stamp on it; that, 17 years before, complainant made a will which was stamped, but never executed a deed and was totally ignorant of making a deed or its requirements; that complainant went to a Notary and acknowledged his signature before him; that Oliphant took the deed and kept it without complainant's consent, saying he could

take care of it when complainant asked for it upon coming out of the Notary's office, to have it examined by a real estate agent named Hyde; that he told Hyde his folks had compelled him to make a will, and Hyde said the will was worthless without witnesses; that complainant had confidence in Hyde's advice and intended to make a proper will after his intended marriage; that he never delivered the deed; that he went to Europe in the spring of 1888, and on his return married Mrs. Maybon in New York on August 13, 1888, and lives with her on the premises in question; that on or about September 14, 1888, he applied to an attorney, recommended by Hyde, to draw his will; that he told the attorney he had made a will, and produced to him a certified copy of it that had been sent to Mrs. Maybon in New York before the marriage, when he was informed that the instrument was a deed and not a will; that this was the first knowledge complainant had that he had signed a deed, and that he was "amazed and dumbfounded with the knowledge of the fraud," etc.

The joint and several answer of the defendants denies all fraud and trickery, and states that complainant had lived for many years, when not travelling, with his daughter and her husband upon the premises in controversy; that he told them of his proposed marriage and said he wished to settle his real estate satisfactorily to his children, as his intended wife had property of her own; that he first proposed to make a will, but was informed that a deed was necessary to make a final settlement; that he said he would deed the land to his children, he to have it while he lived and they to pay his widow $1000.00 when he died; that the children met at his daughter's house at his request and read him a deed which they had caused to be prepared, and he read it over carefully and signed it and said in the morning that he would go before a Notary and acknowledge it; that he is a man of considerable intelligence and large general information; that he reads and writes readily, and has "travelled considerable," and has vis-

ited Europe not less than five different times; that he well knew the difference between a will and a deed; that he gave the deed in consideration of his natural love and affection in accordance with his previously expressed intentions; that the property was accumulated by the joint labors of complainant and the mother of defendants, who at her death left considerable money of her own, which the complainant took without opposition from his children; that they have always tried to make his life pleasant and happy; that, in order to prevent any charge of fraud, they caused a copy of said deed to be delivered to Mrs. Maybon in New York some time before her marriage with complainant; that complainant executed, acknowledged and delivered the deed freely and fairly, knowing it to be a deed of these premises; the answer denies that, on the evening when the deed was signed, it was called a will, or that two or any number of witnesses to a will were spoken of, or that complainant was in any way deceived, or that he asked for the deed after its execution, or said he wished to show it to anybody.

Upon the hearing complainant was allowed to testify to conversations which he had with one Hyde in the absence of either or any of the defendants. Some of these conversations occurred before the making of the deed and some after its execution. He was also permitted to testify to conversations had with his own lawyer in the absence of the defendants. Hyde was also allowed to testify to conversations which he had with complainant, and with complainant's lawyer, when none of the defendants were present. All this testimony was incompetent and should have been excluded. A party cannot be suffered to make evidence for himself by proving his own declarations in his own favor uttered in the absence of those whose interests are sought to be affected. The declarations proven in this case cannot be regarded as a part of the *res gestæ*, because they were not contemporaneous with the act of

making the instrument, but were in the nature of a narrative of past occurrences.

While it is true that a decree in chancery will not be reversed on account of the admission of incompetent evidence, if there is enough other evidence in the record that is competent to sustain the findings of the decree, yet in this case we do not think that the present decree is sustained by the weight of the competent testimony in the record. It rests solely and alone upon the statements of the complainant himself, while those statements are contradicted and overborne by the evidence of four unimpeached witnesses, by.the language of the deed, by the language of the notarial certificate, and by all the inherent probabilities of the case.

The complainant admits, that he consented to make a will, and that by its terms he proposed to give $1000.00 to his wife, and to divide the rest of his property equally between the three children, but says that he "made the arrangement about the property with them   *   *   *   just so as to pacify them and so as to get along smoothly, until he married again, intending to make some other arrangement afterwards." He says he had been advised that he could make a second will which would take the place of the first. According to his own statements, his design was to deceive his children by abandoning the provisions, which he was making for them, as soon as, he should contract his second marriage. The admission thus made reveals a want of entire frankness in his character.

He says that, on February 11, when he concluded to make a will, he gave his children notice to invite Mrs. West to come to the house on the next Monday evening, and they would talk the matter over. Mrs. Oliphant, Joseph H. Liversidge and David H. Oliphant, a young man 21 years old, the son of Mrs. Oliphant, all swear that they were present on February 11, and heard what was said. They swear in substance as follows: that he first proposed to make a will, but Mrs. Oliphant told him that a will would not be worth "a hill of beans,"

as he could "make a will today and another tomorrow;" that he then asked how he could fix it so as to make it satisfactory, and they told him to make a deed; that he thereupon consented to make a deed with the understanding, that $1000.00 should be paid to his widow at his death, and he was to live in the building and have the use and control of the property during his life; that he then directed them to notify Mrs. West to come around on Monday evening, and the matter would then be settled. Young Oliphant states that this conversation took place at the supper table Saturday evening, and that he and his two brothers, and his father and mother, and grandfather, and Uncle Henry, and a niece of his grandfather from England, were all present. Complainant alone states, that he then consented to make a *will,* while three witnesses swear that he agreed to make a *deed.*

Complainant says, that on the next Monday evening when they were all there, he was sitting in his room at the table, when Mr. Oliphant came in, and told him that he had brought the paper for him to sign; that Oliphant laid the paper on the table before him, and told him to sign it, and showed him the line on which to sign, and he signed it, and, before he could take it and look over it, Oliphant folded it up and left the room, and that his son Henry asked him if he knew what he had been doing, and he said he had signed a will. Mrs. Oliphant, Mrs. West and Joseph H. Liversidge all swear that they were present at this time; that Mr. Oliphant read the deed to the complainant and explained it to him, and that he read it over himself, and signed it, and that it lay on the table a considerable time, and he said he would go in the morning and acknowledge it. Mrs. Oliphant says that he told her husband to take charge of the deed. She and her brother swear, that complainant asked why a consideration of $5.00 was named, and Mrs. West swears, that he asked them how they obtained the description of the property. They all swear that his son asked him, after he read the deed, if he understood it.

He went the next morning before a Notary, named Nowak, and acknowledged the deed. Mr. Oliphant and Henry Liversidge were with him.

Henry swears, that complainant told Nowak he understood the contents of the deed; and that he did not ask for it while they were there, nor when they came out. The statement of the complainant that he went before the Notary for the purpose of having a stamp put upon a will seems almost incredible. He was an Englishman by birth and an intelligent man. He had been trustee of a Church, and wrote letters to his family when he was abroad. The Notary certifies in the certificate, that complainant "signed, sealed and delivered said instrument as his free and voluntary act." There is no allegation or proof of any fraud on the part of the Notary, or of any fraudulent collusion between him and any interested party. Hence, his certificate as to the statements made in it must prevail over the unsupported evidence of the grantor in the deed. (*Monroe* v. *Poorman*, 62 Ill. 523; *Canal & Dock Co.* v. *Russell*, 68 id. 426; *Watson* v. *Watson*, 118 id. 56; *Fitzgerald* v. *Fitzgerald*, 100 id. 385.)

The statement of the complainant, that he was not allowed to examine the paper which he signed, does not harmonize with the allegation in his bill that he looked at it and asked how the description had been obtained. There is nothing improbable in the testimony of the witnesses, that the paper was read over several times in view of its extreme brevity. It was drawn up upon a printed blank made out according to the statutory form. The words, "warrantee deed," were printed in large type at the top of the blank and upon the back of it.

The evidence shows very plainly, that complainant's children were very much displeased with the idea of his marrying again, and that his oldest daughter, with whom he lived, manifested her displeasure in a very emphatic way. But we do not think, that any fraud or imposition was practiced upon him, or that the execution of the deed was not his voluntary

act.   There is one circumstance which shows, that the defendants did not intend to conceal the nature of the instrument signed by the complainant.   They sent to Mrs. Maybon at New York City, as soon as they ascertained her address,. a certified copy of the deed made to them by their father, with a notice attached, addressed to her, stating that the deed of which a copy was annexed had been executed, and delivered, and appeared on the records of Cook County.   She received this notice and copy, and she and the complainant examined it before their marriage.

The evidence shows, that the stepmother and second wife took an active part in the preliminary movements for setting aside the deed.   Natural love and affection is a good consideration for such a conveyance.   It is natural and proper that a father should provide for his children.   "It is what the paternal feelings of good men prompt them to do; it is what just men commend and the law tolerates."   (*Wessels* v. *Rathjohn*, 89 N. C. 377.)   Nor does any presumption of fraud arise from the fact that the grantor is the father of the grantees. In the case of a gift from a child to a parent undue influence may be inferred from the relation itself, but never where the gift is from the parent to the child.   (Bigelow on the Law of Fraud, page 358; *Saufley* v. *Jackson*, 16 Tex. 579; *Millican* v. *Millican*, 24 id. 426.)  .

It is to be noted, also, that in this case the father reserves to himself the income of the property and its use and control during his life.   In determining the question of undue influence, a broad distinction is to be taken between a disposition by the donor which takes from him his whole estate and leaves him helpless, and one which provides for him during his life and disposes of his property in a rational mode at his death. (*McClure* v. *Lewis*, 4 Missouri App. 554.)

The decree of the Circuit Court is reversed and the cause is remanded to that Court with directions to dismiss the bill.

*Decree reversed.*