KEITH *v.* KELLAM *et al.*

(*Circuit Court, D. Kansas.* June 5, 1888.)

TRUSTS—CONSTRUCTIVE—CONFIDENTIAL RELATIONS—PRINCIPAL AND AGENT.

The owner of land, who lived at a distance and had never seen it, left the general control of it to an agent for many years, who did everything necessary for its management and preservation, but did not have power to sell, the relation of intimacy and confidence existing. The agent, through correspondence, procured a sale for the benefit of himself and another, who had knowledge of the facts, without disclosing all the facts calculated to enhance the value then and in the near future. *Held,* that the relation was sufficient to charge the agent with full disclosure of all facts touching the land, and, not having done so, the vendor was entitled to have the sale rescinded, and the title declared to be held in trust for him.[1]

In Equity. Bill to set aside a conveyance.

*Quinton & Quinton* and *A. Bergen,* for plaintiff.

*Rossington, Smith & Dallas* and *John T. Morton,* for defendant.

---

[1] A party will not be permitted to purchase property, and hold it for his own benefit, when he has a duty to perform in relation thereto which is inconsistent with his character as a purchaser on his own account. King v. Remington, (Minn.) 29 N. W. Rep. 352, and note. Where an agent takes title to property of his principal, of which he has charge for the latter, fraud is presumed, and, in order to maintain his title, the agent must show affirmatively that he has not abused the trust reposed in him. Le Gendre v. Byrnes, (N. J.) 14 Atl. Rep. 621, and note.

BREWER, J. This is a bill in equity, brought by complainant, Morrell C. Keith, to set aside a sale and conveyance of a certain tract of land in the city of Topeka, made on the 28th day of August, 1886, to defendant Cyrus K. Holliday, and to have defendants adjudged as holding the legal title in trust for him. The contention of complainant is that defendant Edward P. Kellam was his agent; that he was a joint purchaser with defendant Holliday, and that, while assuming to act as such agent, he withheld the information which he ought to have given, and thereby obtained a conveyance at less than the real value. The pivotal question is as to the relations of Kellam to the complainant. It is strenuously insisted by the defendants that whatever authority or agency he may have theretofore had in respect to the land was of a limited and special nature; that he was never an agent to sell; that complainant was advised that he expected to have an interest in the purchase, and therefore the parties dealt rightfully at arms-length. On the other hand, complainant insists that defendant Kellam had acted as his agent in respect to this land for a series of years, that he was the only agent that he had had, and that their relations were such that he had the right to rely upon him, and did so rely in ignorance that Kellam was to share in the purchase, and believing that he was caring for his interests. Now, the facts in reference to the relation between these parties are these: Complainant had owned the land from 18 to 20 years, but had not been in the city of Topeka, nor seen the land, during that time. Kellam had married the niece of his wife, and had visited in his family as a relative. Their personal relations were friendly and familiar; one addressing the other in their correspondence as "Dear Ed," and the other, in response, as "Dear Morrell." During all these years complainant had no one to look after this land in Topeka except defendant Kellam, and the latter had looked after his interests in the land in all things that have transpired to affect it up to this time. True, being unimproved land, there had not been many things requiring attention. He had paid the taxes on the land for complainant; he had informed complainant that the assessment was too high, and appeared before the county commissioners in behalf of complainant two or three times to have the assessment reduced. He accepted, in behalf of complainant, notice of the laying out of highways, and resisted applications therefor. He notified complainant that a railroad company was seeking a way through the land, and by his instructions made resistance thereto. He settled with the railroad company, signing the receipt for damages, "M. C. KEITH, by E. P. KELLAM, Agent." About 1872 he suggested to complainant the fencing of the land, to which complainant assented. The fencing was done under his superintendence, but paid for by complainant; and thereafter he had the use of the land for the pasture of his own cows as well as of others, collecting pay for the latter, and appropriating the same to his own use in consideration for the care of the land. He sold a few tree tops cut on the land, and leased four acres for a base-ball ground. He spoke of himself to parties who inquired about the land as the agent; and discussed with them its value; received offers, and promised to forward them. He suggested to

complainant the propriety of platting the ground, and putting it in his hands for sale. He forwarded a plat of a subdivision that had been laid off immediately adjoining the tract. Now, these things were transpiring from time to time during a series of years. The only person in Topeka to whom complainant looked for the care of this land was defendant Kellam, and the only party there who assumed or appeared to have any control or authority to act for the owner was defendant Kellam. True, he had no authority to fix a price or make a sale, and in the narrow sense of the term he was not an agent to sell, and yet one cannot read the testimony of the relationship of these parties in respect to this land continuing through these many years without being impressed with the conviction that out of that there justly sprang a confidence which imposed special obligations on defendant Kellam. It will not do to separate these different transactions and say that no one of them by itself was sufficient to establish a confidential relation. Cases are cited by defendants' counsel in which a party was employed to do a special act, as, for instance, the payment of taxes, in which it was properly held that from that alone no confidential relation sprang. The only fair way to look at it is to take all these transactions in the aggregate, and determine therefrom how each must have regarded the other. No one can doubt a moment that complainant looked upon Kellam as his agent in respect to the land, as one who was caring for his interests, as one upon whom he had a right to rely; nor can there be much doubt on the other hand that Kellam during these years felt that he was acting for Keith in the care of this land, and was looking after the protection of Keith's interests. The fact that Kellam had no authority to make a sale, or bind Keith by the acceptance of any terms, in no manner disproves the confidential relations which subsisted between the parties. Now, what is the rule of law applicable to a case of that kind? Suppose a sale is accomplished through the instrumentality of one occupying such confidential relation. Happily the law speaks with no uncertain sound in answer to this question. In letters that are golden, and that shine upon every page, it affirms that one who has established such confidential relations must be absolutely loyal to that confidence. It is not enough that direct misrepresentation is avoided. Concealment and silence are fraudulent, and that, too, although they may not be with conscious intent to defraud,—a silence from carelessness and neglect. In the leading case of *Michoud* v. *Girod*, 4 How. 503, the supreme court of the United States discussed at some length the matter of transactions by one having confidential relations with a party for whom he acts. I quote from that opinion: "And the rule of equity is, in every code of jurisprudence with which we are acquainted, that a purchase by a trustee or agent of the particular property of which he has the sale, or in which he represents another, whether he has an interest in it or not, [*per interpositam personam,*] carries fraud on the face of it." And again: "The general rule stands upon our great moral obligation to refrain from placing ourselves in relations which ordinarily excite a conflict between self-interest and integrity. It restrains all agents, public and private; but the value of the prohibition is most

felt, and its application is more frequent, in the private relations in which the vendor and purchaser may stand towards each other. The disability to purchase is a consequence of that relation between them which imposes on the one a duty to protect the interest of the other, from the faithful discharge of which duty his own personal interest may withdraw him. In this conflict of interest, the law wisely interposes. It does not act on the possibility that in some cases the sense of that duty may prevail over the motives of self-interest, but it provides against the probability in many cases, and the danger in all cases, that the dictates of self-interest will exercise a predominant influence and supersede that of duty." And once again: "The inquiry in such a case is not whether there was or not fraud in fact. The purchase is void, and will be set aside at the instance of the *cestui que trust*, and a resale ordered, on the ground of the temptation to abuse, and of the danger of imposition inaccessible to the eye of the court." See, also, 1 Story, Eq. Jur. § 383; 2 Pom. Eq. Jur. § 955 and following. In section 956 the author quotes with approval the language of Lord CHELMSFORD, *Tate* v. *Williamson*, L. R. 2 Ch. 55, as follows:

"Wherever two persons stand in such a relation that, while it continues, confidence is naturally reposed by one, and the influence which naturally grows out of that confidence is possessed by the other, and this confidence is abused, or the influence is exerted to obtain an advantage at the expense of the confiding party, the person so availing himself of his position will not be permitted to retain the advantage, although the transaction could not have been impeached if no such confidential relation had existed."

Now, can it be doubted that complainant, living at a distance, and for years never seeing this property or the city in which it was located, had a right to rely, and did rely, upon defendant, who knew the property and its surroundings, its present value, and all the future prospects; who was his relative by marriage; who had paid his taxes for years, and had looked after every matter affecting the land that had arisen during those years, and who was annually receiving out of the rental of the land compensation for such care and watchfulness,—can there be a doubt, I repeat, that he did rely, and had a right to rely, upon him as upon one who, having cared for his interests in the past, would do so in the present? Not only is this reliance deducible from and justified by their past relations; its existence is evident also from the tenor of the letters during the negotiations for this sale. In May, 1886, complainant wrote to Kellam, and closed his letter with an inquiry as to what the land could be sold for. Then, on June 30th, Kellam, at the instance of his co-defendant, opens the correspondence which results in the sale. This correspondence continued, there being some 14 letters backward and forward, to the 20th of September, 1886. It is scarcely necessary to copy these various letters; the perusal of them shows that Keith was relying upon Kellam to protect his interests. Though situated only a day's ride or such a matter from Topeka, and though the transaction was one amounting to $60,000, complainant does not go there, nor make any personal inquiries, but acts upon the offer communicated from Kellam.

The very carelessness in which some of the letters are expressed, and the manner in which the negotiations were carried on, make it apparent that complainant supposed that Kellam was looking after his interests. This, as I said, is the pivotal question; and yet I think it unnecessary to comment on these facts further. It seems to me clear that complainant did rely, and had a right to rely, upon Kellam as one who was looking after his interests, and that Kellam must have felt conscious of that trust, or, if not actually conscious of it, was at least bound by it. While at the inception of the negotiations he may not have been interested with Holliday in the purchase, yet before the contract was finally closed he did become interested, and the purchase was on the joint account of Kellam and Holliday; and while Holliday may not have been possessed with knowledge of all of the relations between Keith and Kellam, yet he knew enough to put him upon inquiry, and that is equivalent to knowledge. So the purchase was in fact made by those who stood in confidential relations to the complainant. It goes without question, under the testimony, that Kellam did not disclose all the facts within his knowledge which would tend to affect complainant's willingness to sell, or the matter of price. Hence, whether the price paid was adequate or not, complainant has a right to rescind the contract. Without entering into particulars, it is enough to say that Kellam did not disclose offers which were made to him, prices which were put upon the land, the building of railroads into Topeka, which would naturally tend to affect the growth and prosperity of the place, or the speculation in real estate, which was rapidly developing during that summer. It well may be that, if these facts had been reported, complainant might have declined to sell, or at least named a higher price. It is certainly suggestive that within less than one month the purchasers who had paid $60,000 named twice that sum as their selling price. In conclusion let me say that, while I think complainant has a right to rescind this contract by reason of the failure on the part of his agent, a joint purchaser, to disclose all facts material to the matter of sale and the question of price, it is also due to the defendants to say that it does not appear that there was any conspiracy between them to defraud complainant, or that they were seeking to obtain the land at less than its then real value. They stood in the early days of a remarkable real-estate speculation, and they offered and gave what was probably an adequate price, seeking only the chances of that growing speculation; but even that complainant was entitled to, and should have been advised of all facts that were known to Kellam throwing light upon present value or future prospects. Complainant is entitled to a decree in accordance with the terms of his bill.