[No. 16464.    Department Two.    September 16, 1921.]

FREDA W. HEMRICH, *Respondent*, v. AMELIA HEMRICH
*et al.*, *Appellants*.[1]

TRUSTS (38½)—ACTIONS—EVIDENCE—BURDEN OF PROOF.    The
burden of proving immaculate faith in transactions between a trus-
tee and a *cestui que trust* rests upon the trustee, especially where
the *cestui que trust* is of immature age, judgment and experience.

TRUSTS (46, 47)—ENFORCEMENT OF TRUST—RIGHT TO TRUST FUNDS
—FRAUD OF TRUSTEE.    Undue influence and constructive fraud is
shown supporting an action by the widow of the *cestui que trust* to
recover a trust estate, where it appears that a mother, who had been
made trustee of an estate under the will of her deceased husband,
whereby two-thirds was devised to the children, induced a child of no
business experience or judgment, and who was under her influence,
to convey his entire interest, amounting to practically $100,000, to
her without other consideration than that of support and the pros-
pect of sharing in the mother's estate on her death.

SAME (49)—ACTIONS TO ENFORCE TRUST—LIMITATION AND LACHES.
A delay of four years in bringing action to set aside a conveyance
procured by parent from child by means of constructive fraud and
undue influence does not amount to laches when no injury has been
caused by not beginning the action earlier.

WILLS (79-85)—RIGHTS OF DEVISEES—DEED TO EFFECT TESTATOR'S
INTENTION—CONSIDERATION.    Where a brother, without consideration,
conveyed all his interest in a certain piece of property to his sister,
in order to carry out an expressed intention of the deceased father
to give that property to his daughter, such deed could not be after-
wards set aside at suit of the administratrix of such brother.

Appeal from a judgment of the superior court for
King county, Ronald, J., entered November 30, 1920,
upon findings in favor of the plaintiff, in an action to
recover an interest in an estate, tried to the court.
Modified.

*Peters & Powell* and *Greene & Henry*, for appel-
lants.

*John B. Hart* and *F. C. Kapp*, for respondent.

[1]Reported in 201 Pac. 10.

MACKINTOSH, J.—This action is to recover an interest in the estate of Andrew Hemrich, deceased. Andrew Hemrich died in the city of Seattle on May 2, 1910, possessed of an estate which was worth in the neighborhood of $600,000. There survived him his widow, Amelia Hemrich, and five children: John, Alvin, Ernest, Katherine and Carl. All of these except Carl are living and are parties defendant in this action. Katherine is now married to Wilbur W. Scruby. By the terms of the will, one-third of the estate was left to the widow and the other two-thirds were devised to the five children to ''be divided between the said children share and share alike, each of said children to come into possession as follows: each of my sons when he shall arrive at the age of 25 years and my daughter . . . when she shall arrive at the age of 21 years.'' Under the will the widow, deceased's brother, and the son John were appointed executors and trustees. The will further provided for the support, maintenance and education of the children from the funds of the estate. Carl was the youngest of the children and attained his 21st birthday on July 18, 1915. In May, 1917, he was married to the plaintiff in this case, and on November 28, 1918, Carl died, not yet having arrived at the age of 25 years. Carl's widow is claiming a two-fifteenths interest in the estate as heir and administratrix of her deceased husband. In 1911, all of the children except Carl, having then arrived at their majority, conveyed all their interest in their father's estate to their mother, and on August 28, 1915, which was 41 days after arriving at his majority, Carl conveyed his interest in his father's estate to his mother. The deed of conveyance was not filed for record until March 16, 1917. He conveyed to the Andrew Hemrich Investment Company, which was in

effect a conveyance to his mother, as will appear by a further recitation of the facts in regard to the incorporation of this company. In November, 1910, the Andrew Hemrich Investment Company was incorporated, to which, as already stated, the widow and all the children except Carl conveyed their respective interests in their father's estate. The capital stock of the company was used in payment of these transfers, and the shares of stock which were issued to the children were indorsed by them and delivered to their mother. These conveyances and transfers vested the title of these children in their mother.

On November 8, 1911, the executors under the will filed their final account and petition for distribution in which it appeared that the widow and the four children had transferred all their interest to the Andrew Hemrich Investment Company, and that the eldest child, John, was the only one who had then arrived at the age of 25 years. The petition asked that the one-third of the estate devised to the widow should go to the Andrew Hemrich Investment Company, as also should John's share, and that the shares of Alvin, Ernest and Katherine, who were of age but not yet 25 years, and Carl, who was not then of age, should be distributed to the trustees under the will; the shares of Alvin, Ernest and Katherine to be held by these trustees until these children should each arrive at the age of 25 years, when their shares should be turned over to the Andrew Hemrich Investment Company, and as Carl was yet a minor and had made no transfer to the investment company, the disposition of his share of the estate was not referred to. The order of distribution was made as prayed for on September 5, 1913. On August 10, 1915, eighteen days before the conveyance by Carl to the investment company, he

received from his mother two checks, aggregating $5,260, and on September 16, 1915, he received a further check from his mother of $2,640, which amount, however, he shortly afterwards repaid. All of this money was derived from income from the various properties of the estate.

On March 19, 1917, the investment company was dissolved for the reason that it had served its purpose, and the widow being the sole owner of all its stock, which represented the entire estate of her deceased husband, there existed no longer any reason for the continuance of the corporation, and its assets were turned over to her. This deed from the investment company was dated the same day the petition for dissolving the corporation was filed. In January, 1919, occurred the first denial of respondent's interest in the estate, which was followed by a formal demand in September, 1919, for that share.

The above is a recital of the main facts in the case which show the manner in which the entire estate of Andrew Hemrich, deceased, came into possession of Amelia Hemrich, his widow, devisee, executrix and trustee under the will, and are the facts upon which she now claims to be the sole owner in her own right of all the estate.

The complaint, among other things, alleges that the defendants, through fraud and undue influence and conspiracy, prevented the distribution to the respondent of Carl's share of his father's estate. It further alleges that the property was taken in trust for Carl by the defendants. The answer denies that there is any trust and alleges that Carl, after arriving at the age of 21 years, and before his marriage to the plaintiff, conveyed all his interest to the Andrew Hemrich Investment Company as a gift to his mother. The re-

ply alleges that, when Carl made his conveyance, he was not yet 25 years of age, and consequently he had no interest in his father's estate vested in him at that time that he could alienate, and that the conveyance was therefore void; the allegation is repeated that the conveyances were obtained from Carl by fraud, misrepresentations and undue influence, and that the conveyance by Carl was made in trust; and further, that, under the terms of the will, the property was to be held for him by his mother in trust. There are a couple of other matters involved in this appeal which we will refer to at the close of this opinion, but the statement of them here would only complicate the examination at this point.

The trial, in which an enormous amount of evidence was produced, resulted in a decree awarding the respondent judgment against the appellants, executrix and executors and trustees under the will, in the sum of $75,284.87, and directed that the conveyance made by Carl in his lifetime to the Andrew Hemrich Investment Company be cancelled on the ground that it was void.

The first question presented by the pleadings and the evidence in the case is whether, at the time that the transfer was made by Carl, he had an interest in his father's estate which had become vested and which was alienable by him. The industry of counsel has resulted in the collection of a great many authorities bearing upon this question, but in view of the point upon which this case must ultimately turn, it is unnecessary to review them in this opinion, and we may here tentatively adopt the theory of the appellants that the language of the will is not ambiguous, and that under the sixth paragraph Carl took a vested interest immediately upon his father's death, which interest he could alienate

before he arrived at the age of 25 years, and it may furthermore be assumed for the purpose of this case that there was no devise by implication to Carl's widow.   ·

The contention by the respondent that the convey-·ance by Carl was an express trust conveyance to his mother may also be assumed for the purpose of this case to be unfounded, and it is therefore unnecessary to discuss the great number of authorities bearing upon the question of whether parol evidence was admissible to establish such a trust, and we may pass to the question that is determinative of the controversy.

The evidence shows that Carl, at the time he arrived at the age of 21 years, was residing with his mother in her home; that he had never been engaged in any self-supporting pursuit or vocation; that neither by mental attainment nor education was he fitted for any particular line of endeavor; that his business judgment and experience were nil; that he was what might be called the typical son of a self-made man, from whom he might inherit a fortune, but not the native ability which created it. He was dependent entirely upon his mother for whatever spending money he had and was under her control and domination; he was, as she expressed it, "a good boy"; having a true filial regard for his mother, obedient to her discipline and unquestioning her authority, which although not asserted in any rigid manner, was possibly, on that account, the better observed. He was familiar with the fact that his brothers and sisters had placed their share of his father's estate in the mother's hands, and although death has deprived us of his testimony, it is only fair to believe that the entire atmosphere of the family relationship compelled him to do likewise. His share, which amounted at the time well towards $100,-

000, was transferred for nothing, if we are to believe the appellants' position; transferred without any assurance that ultimately he might not be the object of charity; in fact, if he was to continue living in the same manner in which he had been reared, he must thereafter, of necessity, be the subject of his mother's bounty, and must await her death before receiving any independent resources, and take chances on what they might amount to. The receipt by Carl of some $5,000 on or about the time of this conveyance is not contended by the appellants to have been a consideration for the transfer by him of his estate, and, in fact, it could not be so, in face of the provisions of the will which called for his support and maintenance, and from the further fact that the money was paid out of the income of the estate, which included Carl's share thereof, and from the further fact that the receipt of this money was not unlike the receipt by the other children of similar amounts. It is not necessary to characterize the lack of documentary evidence which might be of assistance in determining the matters in controversy, nor to analyze and determine the motives which prompted some palpable alterations in records which were actually produced, and the condition in which others appear among the exhibits, nor to speculate upon the conduct at the time of Carl's illness and death.

The rule—and it is a salutary one—which compels courts to scrutinize with caution transactions between trustees and the *cestui que trust,* and to lay upon the trustee the burden of proving immaculate faith, when title of the *cestui que trust* is found in the trustees, and especially where that *cestui que trust* is of immature age and judgment and experience, is a rule to which the facts of this case imperatively demand the application.

Under this nonintervention will the mother became one of the trustees for Carl (*Newport v. Newport,* 5 Wash. 114, 31 Pac. 428; *Smith v. Smith,* 15 Wash. 239, 46 Pac. 249; *In re Cornett's Estate,* 102 Wash. 254, 173 Pac. 44) ; and under the decree of distribution she was referred to as a trustee. The rule which we have indicated is supported by a veritable Sinbad's treasure trove of legal authorities, and has been so well stated by so many courts and text writers that it is difficult to refrain from extensive quotation.

The supreme court of Virginia, in *Branch v. Buckley,* 109 Va. 784, 65 S. E. 652, quoted from sections 956 *et seq.,* Pomeroy's Equity Jur. as follows:

"While equity does not deny the possibility of valid transactions between the two parties, yet because every fiduciary relation implies a condition of superiority held by one of the parties over the other, in every transaction between them by which the superior party obtains a possible benefit, equity raises a presumption against its validity, and casts upon that party the burden of proving affirmatively its compliance with equitable requisites, and of thereby overcoming the presumption . . . The court will not allow the transaction between the parties to stand, unless there has been the fullest and fairest explanation and communication of every particular resting in the breast of the one who seeks to establish a contract with the person so entrusting him. . . .

"The transaction is not necessarily voidable. It may be valid; but a presumption of its invalidity arises, which can only be overcome, if at all, by clear evidence of good faith, of full knowledge, and of independent consent and action. . . . 'A purchase by a trustee from his *cestui que trust* even for a fair price and without any undue advantage, or any other transaction between them by which the trustee obtains a benefit is generally voidable and will be set aside on behalf of the beneficiary; it is at least *prima facie* voidable upon the mere facts thus stated. There is, however,

no imperative rule of equity that a transaction between the parties is necessarily, in every instance voidable. It is possible for the trustee to overcome the presumption of invalidity. If the trustee can show by unimpeachable and convincing evidence that the beneficiary being *sui juris* had full information and complete understanding of all the facts concerning the property and the transaction itself, and the person with whom he was dealing, and gave a perfectly free consent, and that the price paid was fair and adequate, and that he made to the beneficiary a perfectly honest and complete disclosure of all the knowledge or information concerning the property possessed by himself, or which he might with reasonable diligence, have possessed, and that he has obtained no undue or inequitable advantage, and especially if it appears that the beneficiary acted in the transaction upon the independent information and advice of some intelligent third person, competent to give such advice, then the transaction will be sustained by a court of equity. The doctrine is enforced with the utmost stringency when the transaction is in the nature of a bounty conferred upon the trustee—a gift or benefit without full consideration. Such a transaction will not be sustained, unless the trust relation was for the time being completely suspended, and the beneficiary acted throughout upon independent advice, and upon the fullest information and knowledge.' "

And the court in that case added:

"Under well established principles of equity, independent of the question of actual fraud, transactions between parties occupying the relation to each other which existed between the appellant and complainant at the time the former acquired title to the trust subject are at least *prima facie* fraudulent."

Perry, Trusts (5th ed.), §§ 194, 195, 197, 427, and 428, in a luminous presentation of this phase of the law, says, *inter alia:*

"Sec. 194: . . . Thus, if a parent buys property of his child, a guardian of his ward, a trustee of his

*cestui que trust,* an attorney of his client, or an agent of his principal, equity will either avoid the contract altogether, without proof, or it will throw the burden of proving the fairness of the transaction upon the purchaser; and, if the proof fails, the contract will be avoided, or the purchaser will be construed to be a trustee at the election of the other party. The ground of this rule is, that the danger of allowing persons holding such relations of trust and influence with others to deal with them is so great that the presumption ought to be against the transaction and the person holding the trust or influence ought to be required to vindicate it from all fraud, or to continue to hold the property in trust for the benefit of the ward, *cestui que trust,* or other person holding a similar relation. . . ."

"Sec. 195: These principles are applied in their full vigor to all contracts and sales between trustee and *cestui que trust.* The trustee is in such a position of confidence and influence over the *cestui que trust,* that the contract or bargain will either be void or he will be a constructive trustee, at the election of the *cestui que trust,* unless the trustee can show that the contract was entirely fair and advantageous to the *cestui que trust.* The presumption is against the transaction. . . . The general rule is, that the trustee shall not take beneficially by gift or purchase from the *cestui que trust,* even although the supposed trustee and purchaser is a mere intermeddler and not a regularly recognized trustee; the question is not whether or not there is fraud in fact, the law stamps the purchase by the trustee as fraudulent *per se,* to remove all temptation to collusion and prevent the necessity of intricate inquiries in which evil would often escape detection, and the cost of which would be great. The law looks only to the facts of the relation and the purchase. The trustee must not deal with the property for his own benefit. . . . And it may be said generally that it is difficult to find a case where such a transaction has been sustained. Any withholding of information, or ignorance of the facts or of his rights on the part of the *cestui* or any inadequacy of price, will make such a purchaser a constructive trustee. . . . "

''Section 197: It is thus seen that the rule against purchasing by trustees, of the *cestui que trust,* amounts almost to prohibition. . . .''

''Section 427: . . . No other rule would be safe; nor would it be possible for courts to apply any other rule, as between trustee and *cestui que trust.* . . .''

''Section 428: . . . Nor can the trustee make any contract with the *cestui que trust* for any benefit, or for the trust property, nor can he accept a gift from the *cestui que trust.* The better opinion, however, is, that a trustee may purchase of the *cestui que trust,* or accept a benefit from him, but the transaction must be beyond suspicion; and the burden is on the trustee to vindicate the bargain or gift from any shadow of suspicion, and to show that it was perfectly fair and reasonable in every respect, and courts will scrutinize the transaction with great severity.''

The strength of the position indicated by these authorities cannot be increased by reciting from the legion of additional authorities: *Michoud v. Girod,* 45 U. S. 502; *State v. Culhane,* 78 Conn. 622, 63 Atl. 636; *Butman v. Whipple,* 25 R. I. 578, 57 Atl. 379; *Keith v. Kellam,* 35 Fed. 243; *Swift v. Craighead,* 70 Atl. (N. J.) 666; *Reeder v. Meredith,* 78 Ark. 109, 93 S. W. 558; *Gassert v. Strong,* 38 Mont. 18, 98 Pac. 497; *Clay v. Thomas,* 178 Ky. 199, 198 S. W. 762.

The principle has been recognized by this court in *Gardella v. Meeker,* 3 Wash. Terr. 178, 13 Pac. 709; *O'Neile v. Ternes,* 32 Wash. 528, 73 Pac. 692; *In re Goss' Estate,* 73 Wash. 330, 132 Pac. 409; *Stewart v. Baldwin,* 86 Wash. 63, 149 Pac. 662. Nor, as we read them, do the cases of *Couchman's Adm'r v. Couchman,* 98 Ky. 109, 32 S. W. 283; *Gifford v. Thorn,* 9 N. J. Eq. 702; and *Williams v. Canary,* 249 Fed. 344, establish any other principle.

Under this rule the fact that the trustee is found in possession of the property of her *cestui que trust* places upon her the burden of showing the utmost good

faith. The testimony in this case establishes no such situation.

However strong the rule may be in denying to the trustee the right to acquire the property of the *cestui que trust* without full consideration and free from the slightest taint of suspicion, the courts are just as alert to set aside unconscionable transactions between parent and child. The supreme court of Illinois, in the case of *White v. Ross,* 160 Ill. 56, 43 N. E. 336, had before it an action resembling the situation presented in this case, and at the expense of lengthening this opinion to an almost unwarranted length, we will quote from that decision:

"The third ground or proposition upon which the decree is sought to be sustained, and the one which we find is sustained by the evidence, and supported by abundant authority, may be stated thus: That at, and before, and after the time or times when the deeds in question were made and delivered, the relation of parent and child existed in its full vigor between the mother, Ann White, and the daughter Annie C. White; that the position of the mother was one of dominance and authority over the daughter, and of the daughter of dependence upon the mother; that the daughter confided in and trusted her mother implicitly; that the mother was already possessed of an abundance of means for her own support—even of wealth—and that the property conveyed to the mother by the daughter was of large value, exceeding $200,000, and embraced her entire estate, and substantially all her means of support; that the daughter was an invalid, without any business, occupation or profession, wholly unacquainted with business affairs and the forms and instrumentalities by which conveyances of property are made from one person to another, and wholly unable, by reason not only of bad health but of lack of business education, training and experience, to earn her own living; that nothing was paid or agreed to be paid to the daughter Annie C. White for all the vast property so conveyed; that she had no independent

advice, and did not understand that she was divesting herself absolutely of all her property rights; that the gift was improvident and unreasonable on the part of the daughter to make, and unconscionable on the part of the mother to accept; and that under such circumstances the presumption of undue influence arises, and that the conveyances in question were obtained by undue influence of the mother over the daughter; and that the burden of proof is on the mother, and those claiming under her, to show that the daughter acted independently, advisedly and of her own free, intelligent will and accord, uninfluenced by the recipient of so munificent a gift, and, no such proof having been made, that, independently of any question of actual fraud, the transaction must be held to be constructively fraudulent, and that a court of equity will raise a constructive trust, and fasten it upon the conscience of the holder of the legal title, and convert such holder into a trustee, for the party who, in equity, is regarded as the beneficial owner.

"The ultimate facts stated in the last proposition are established by the evidence in this case, and are in substantial accordance with the findings of the two chancellors who, on different trials, heard the case below on both oral and written testimony. That such conveyances of property, made under such circumstances are presumably voidable there can be no reasonable doubt. This rule in equity is established by the great weight of authority both in England and this country, and is founded on principles of justice and morality. . . . In such cases courts of equity will interfere upon grounds of public policy, or, as often stated, for the preservation of mankind, and, unless the donee can show affirmatively that the transaction is a 'righteous one' it will be set aside.

"It is contended by the appellants that such is not the rule in this country, but that the parental authority over the child is only a circumstance to be proved with others tending to establish undue influence; that, notwithstanding a conveyance or gift be shown to have been made by the child to the parent at a time, though of full age, when the child was under the dominion

of the parent, still the transaction cannot be impeached without some affirmative proof of the exercise of undue influence on the part of the parent, or that the parent was guilty of some fraud, imposition or wrongdoing in obtaining the advantage bestowed; and it is claimed that their contention is supported by the authority of the supreme court of the United States in *Jenkins v. Pye,* 12 Pet. 241. . . .

"In *Jenkins v. Pye* the father paid a valuable, though, perhaps, an inadequate consideration for the property conveyed, and the doctrine of *laches* was also applied as a ground for denying relief. In a separate opinion, Mr. Justice Catron, while concurring in the decision of the case on the ground of *laches,* took issue with the opinion of the court delivered by Mr. Justice Thompson on the other branch of the case. In the subsequent cases of *Taylor v. Taylor,* 8 How. 184, and *Allore v. Jewell,* 94 U. S. 506, the doctrine as announced by the same court does not materially differ from the general current of authority on the subject, and the question of unreasonableness and unfairness in the transaction is made to cut an important figure. Judge Story, in his work on Equity Jurisprudence, (vol. 1. sec. 309,) says 'The natural and just influence which a parent has over a child renders it peculiarly important for courts of justice to watch over and protect the interests of the latter, and therefore all contracts and conveyances whereby benefits are secured by children to their parents are objects of jealousy, and, if they are not entered into with scrupulous good faith, *and are not reasonable under the circumstances, they will be set aside,* unless third persons have acquired an interest under them.' So in Perry on Trusts it is said, that while courts of equity will scrutinize conveyances of property by children to their parents, they are not *prima facie* void, but that there must be some affirmative proof of undue influence or other improper conduct to render the transaction void. But it is also said that 'the position and influence of parent over a child are so controlling that the transaction should be carefully examined, and sales by a child to a parent *must appear* to be fair and reasonable.' So,

also, in Hill on Trustees, 157, it is said that 'every contract or conveyance whereby benefits are secured to parents by their children must be perfectly fair and reasonable in all its terms and circumstances, or otherwise it will be set aside.' It is true, the author says that before this will be done it will be necessary to prove the exercise of undue influence, or to establish some other case of actual *or constructive fraud* against the parent. So, too, in the citation from Newland on Contracts, the author makes the reasonableness of the transaction an important element. It is there said that equity has refused to interfere because of the mere relation of parent and child, especially where the agreement was reasonable, or entered into to effect a laudable purpose. In *Oliphant v. Liversidge,* 142 Ill. 160, 30 N. E. 334, this court in sustaining a deed of gift from father to child said (p. 170) : 'Nor does any presumption of fraud arise from the fact that the grantor is the father of the grantees. In the case of a gift from a child to a parent undue influence may be inferred from the relation itself, but never where the gift is from the parent to the child.' In *Finucan ·v. Kendig,* 109 Ill. 198, and *Patterson v. Johnson,* 113 Ill. 559, this court distinctly recognized the question of unreasonableness and improvidence in the transaction as an element to be considered in determining its binding force upon the parties. In the latter case such facts and circumstances were proved as showed the transaction a reasonable and proper one, and this court said (p. 572) : 'The record shows that there was no influence whatever used by the father to procure the deed, and that it was made by the daughters of their own volition. The making of the deed was a graceful tribute of filial affection.'

"If a child possessing wealth should while under parental control, though past minority, make a deed of gift of property of substantial value to his indigent parent, sufficient to maintain such parent in .comfort, and even elegance, the remainder of his life, but reserving sufficient for his own needs, thus eliminating from the transaction all improvidence, all unreasonableness, and all apparent unconscientiousness on the

part of the parent, it might be justly contended that
the rule would be a harsh one that would cast the
burden of proof on the parent, or on those claiming
under him, to prove that no undue influence was re-
sorted to to obtain the gift. But where, as in this
case, the transaction appears to have been an improvi-
dent and unreasonable one for the child to enter into,
and one apparently involving the taking of an un-
conscionable advantage by the parent, in accepting and
retaining the property, there can be no doubt, from
the standpoint of any well-considered case, that the
burden of proof is cast upon the parent to prove that
the transaction was, in the language often used, 'a
righteous one.' ''

See, also, *Taylor v. Taylor,* 8 How. (U. S.) 183,
where the supreme court of the United States, in a
long opinion, reviewed the theory involved here and
stated the rule with extreme clarity and force, saying:

'' 'But when such a relation (the fiduciary one) does
exist, courts of equity, acting upon this superinduced
ground, in aid of general morals, will not suffer one
party, standing in a situation of which he can avail
himself against the other, to derive advantage from
that circumstance.' . . .

''It is shown that the grantor in this deed, though
of age, had little more than attained to majority; that
she was living in the house with her parents—her only
home; and may fairly be presumed to have been liable
to the influence of feelings and habits which, in the
absence of contravening evidence, would control the
dispositions and conduct of a youthful female thus
situated. She might be moulded to almost anything,
in compliance with the earnest wishes (with her
habitually yielded to as commands) of her parents.
. . .

'' And it has been argued that, with her knowledge of
the situation of her parents, the impulses of filial duty
and affection might of themselves have formed a suf-
ficient groundwork for the complainant's conveyance.
However hazardous it might be to prescribe, as a rule
of right or of property, imperfect obligations which the

law does not originally enforce, this argument can be deemed satisfactory in instances only in which the motives supposed to enter into such obligations are shown to have been free and unconstrained in their operation. In the present instance, too, independently of the influences which will be shown to have been brought to bear upon the transaction, it is thought that the injunctions of filial duty and affection would have demanded something less than the surrender of all possessed by the grantor. . . . Nay, it would seem that proper *parental* tenderness, and solicitude for the welfare of the child, or the true principles of rectitude and fairness, would have permitted nothing beyond this. . . ."

See, also, *Ludington v. Patton,* 111 Wis. 208, 86 N. W. 571; *Walters v. Walters,* 26 N. M. 22, 188 Pac. 1105, and this court's opinion in *Muzzy v. Tompkinson,* 2 Wash. 616, 27 Pac. 456, 28 Pac. 652. This appears in the *Muzzy* case, *supra*:

"If we seek undue influence in this case, it is easily found. . . . Of reasonableness in this arrangement there was none, unless it be considered reasonable in every case for a father to take from his child her real estate without consideration. . . ."

So here, the burden being upon Mrs. Hemrich to show that her acquisition of Carl's property was proper, she has not sustained it. The whole transaction, with all its surrounding circumstances, and the testimony offered in support of it, must convince a court of equity that, while there may not have been actual fraud, there was undue influence and constructive fraud, and that the trial court was correct in determining that Carl's share of the estate should go to the respondent.

As to the value of that share, the record is bulging with testimony directed to the correct valuation of the estate, and after a painstaking review of it, we cannot

say that the trial court did not arrive at the correct amount, although there is considerable room for argument that it might correctly have been increased to a considerable extent.

Laches is urged against the respondent's action, and the case of *Jenkins v. Pye,* 12 Pet. (U. S.) 241, where there had been a twenty years' delay, and *Ripple v. Keuhne,* 100 Md. 672, 60 Atl. 464, where one of eight years had occurred, are cited as authorities, but we find here no delay in asserting Carl's rights and no injury has been caused by not beginning an action earlier than was done.

We will now pass to two other questions which are presented by the record.

The lower court allowed a personal judgment against Amelia Hemrich in the sum of $10,000, arising from the sale by her of what was known as the Capital Hill home property, the proceeds of which she distributed by giving each of the children the sum of $10,000. The books show that the cash payments were made to all but Mrs. Scruby and Carl, and the testimony as to them is that they did not desire the cash, but allowed the mother to keep it and pay them six per cent interest on it. This testimony is contradicted, but as we read it, we are not inclined to disagree with the conclusion arrived at by the trial judge, who was more advantageously situated to pass upon its credibility than we.

The next minor point urged by the appellant is that the judgment in favor of the respondent against Katherine Scruby and her husband, based upon a deed made by Carl to his sister after he arrived at his majority was erroneous. The court held this conveyance was without consideration and void. We are of the belief, from the testimony, that Andrew Hemrich had

expressed, during his lifetime, his intention of giving a certain piece of property to his daughter, and that in furtherance of this intention the Andrew Hemrich Investment Company executed this deed, and Carl, when he arrived at the age of 21, in order to complete his sister's title, gave his deed to her, and although this was without consideration, we do not think that it is the basis of a judgment against Mrs. Scruby, and the action of the trial court in granting such judgment is reversed.

Upon the whole record, the superior court's judgment is affirmed, except as to the judgment against the Scrubys on the lot received by deed from Carl. The respondent is allowed costs against all the appellants except the Scrubys, who are awarded costs in the sum of $100 against the respondent.

PARKER, C. J., MITCHELL, and TOLMAN, JJ., concur.