[No. 16671.   Department Two.   June 20, 1922.]

GRETCHEN RANKE MEYER, *as Executrix etc., et al.,*
*Appellants,* v. JOHN T. CAMPION *et al.,*
*Respondents.*[1]

G_FTS (8)—VALIDITY—PRESUMPTIONS—BURDEN OF PROOF — EVI-
DENCE—SUFFICIENCY.  Where an aged woman, in precarious health,
had placed all her holdings in a corporation which was managed
by her son-in-law, a business man of ability and forceful character,
who was her only adviser, the burden of proof is upon the son-in-
law to establish that a division, shortly before her death, of all
the capital stock into four equal parts, one of which, of the value of
$100,000, was issued to him, was intended as a gift; and he fails
to sustain the burden where the proof rests upon the evidence of
his wife, who got one share, as to a conversation with the deceased,
and it appears that deceased had no independent advice from any-
one else, he prepared all the papers, and from his contradictory
statements made to various persons, it appears probable that no
gift was intended.

Appeal from a judgment of the superior court for
King county, Gilliam, J., entered April 8, 1921, in favor
of the defendants, dismissing an action to set aside a
purported gift of corporate stock, tried to the court.
Reversed.

*Lyons & Orton, Bogle, Merritt & Bogle,* and *Chad-
wick, McMicken, Ramsey & Rupp,* for appellants.

*McClure & McClure,* for respondent John T. Cam-
pion.

*Peters & Powell,* for respondent Mamie Ranke Cam-
pion.

HOVEY, J.—Appeal from a judgment dismissing an
action seeking the surrender of shares of stock stand-
ing in the names of the several individual parties to
the action.

[1]Reported in 207 Pac. 670.

The real controversy in this case is the actual owner-
ship of 1,250 shares, being one-fourth of the capital
stock of the Ranke Investment Company, a corpora-
tion of the nominal capitalization of $500,000, and the
actual value being approximately the same. These
shares now stand in the name of the respondent
John T. Campion. The corporation was organized
in the year 1909 to take over the holdings of Dora
D. Ranke, who was the mother of the appellant
Gretchen Meyer and the respondent Mamie Camp-
ion, and the latter is the wife of respondent
John T. Campion. The principal property of the
corporation is a business corner in the city of
Seattle, which was owned by Dora D. Ranke and
her husband at the time of the latter's death in
the year 1892, and which was estimated by the real
estate experts at the time of the trial to be worth from
$320,000 to $400,000. There is also a residence prop-
erty estimated to be worth $35,000 to $40,000, but of a
rental value which will produce a net income on a con-
siderably smaller valuation. The balance of the cor-
poration's holdings consist chiefly of securities valued
at something over $60,000.

Dora D. Ranke was born in Germany, but came to
this country at an early age, and at the time of the
death of her husband they had four children living.
Two of these were boys, who died subsequent to the
making of the will hereafter referred to and prior to
the death of their mother. Mrs. Ranke appears to
have been a clear-headed, sensible business woman,
rather careful with her money and, as termed by one
of her daughters, rather frugal in the spending of it.
It is claimed that she was extraordinarily competent
in business affairs, but we do not find in the record any
evidence of any special capacity. She was careful to

live within her income, but about the only business she had to do was to receive her rents, and for the collection of these she employed the janitor of the building up to the year 1909, when the corporation was organized. After the organization of the corporation, respondent Campion took charge of the collection of rents, and for a portion of the time Mrs. Ranke kept what are the only business records of the corporation in a small book in which she posted five or six entries each month of rent received, and on the opposite page the disbursements of the corporation. These were few in number, as a rule, comprising a monthly salary paid to the respondent Campion, and items for water rent, taxes and insurance. In addition to this, there was a check book. There does not appear to be any book record of Mrs. Ranke's personal transactions.

Mrs. Ranke enjoyed the friendship of several women, several of them being wives of prominent business men in Seattle, and several of whom were witnesses at the trial. She was very fond of cards and frequently had games in the afternoon or evening, in which she usually played cards for small stakes, and primarily for amusement, for, as one of the witnesses said, she always stayed whether she had anything or not. She spent several years in Europe following the organization of the corporation, and upon June 6, 1916, being a year or two after her return from her last trip, she suffered what is termed a paralytic stroke, from which she was unconscious for a short time and which rendered her more or less an invalid for the balance of her life. The condition of Mrs. Ranke after this time is a subject of considerable dispute in the testimony. It is agreed that her right side was partially paralyzed, and practically all the witnesses testified that she could not walk without assistance and that she became slow in her speech. She had the services of a trained nurse

for several months and was never without a companion employed to look after her. As soon as she was able to get around, she resumed her card games, using a rack to hold the cards and having one of her friends to deal them for her. In addition to this diversion, her companion read to her such items from the daily paper as interested her. She continued to direct her household affairs, but outside of the incident of the purchase of the automobile, hereafter referred to, she does not appear to have attended to any business of any moment after her illness, unless we are prepared to accept the version of the stock distribution claimed by the respondents to have occurred in January, 1917, six months after she was stricken.

In the year 1902, Mrs. Ranke executed a will by which she devised and bequeathed all her property to her four children then living, in equal shares. This will was never changed and was duly probated upon her death, and appellant Gretchen Meyer and respondent Mamie Campion are the qualified executrices under the will. The testimony shows without dispute that Mrs. Ranke, in her attitude towards her two daughters and in speaking of them to her intimate friends, showed an absolute impartiality. Whenever she made one a gift, she either made the same gift to to the other or one of equal value. She was fond of fine linen, and whenever she made a purchase of an article of that sort she usually bought two so there would be one for each girl. She frequently made the statement that her daughters would get all she had, and there is some testimony to the effect that she said that her sons-in-law would get none of it.

A short time before she died, Mrs. Ranke expressed a desire for an automobile of the closed type, and, over the opposition of the respondents, purchased such a car at an expense of about $8,500, less some credit

that she received for her old car. The testimony shows that, in the events leading up to the purchase of this car, Mrs. Ranke occupied anything but a position of untrammeled independence in the management of her affairs, and it was only after she had been encouraged by one of her women friends and aided by the co-operation of her two grandchildren, one of whom signed her name to the contract for the car after the respondent Campion had refused to do so, that she finally secured the automobile. Mrs. Ranke died on April 30, 1919, at the age of seventy years.

The respondent John T. Campion, at the time of the trial, was 55 years of age and was then general manager and treasurer of the Seattle Brewing and Malting Company, and had been its treasurer since the year 1900. He is a man of forceful and dominant character. He and his family, consisting of his wife, the respondent Mamie Campion, and their son Cyrus, resided continuously in the city of Seattle during the time material to this controversy. The other daughter, the appellant Gretchen Meyer, resided with her husband away from the city of Seattle during the most of the time, except for visits that she paid to her mother. It is alleged in his answer, and admitted by appellant, that there existed between Campion and Mrs. Ranke great love and affection and that she looked upon him as her own son. Viewed from the record, this seems true only in part. He was the only man in the family who lived near the mother, and held the position of the favored son-in-law from whom much was expected in the way of service without any idea of direct remuneration. He had, however, considerable incentive to promote Mrs. Ranke's welfare; his wife was a prospective heir to one-half of the estate; he made large loans to his fellow officers in the brewery, and the control of ready money is not without its advantage to a business man,

even though, as is admitted in this case, there was no improper use of the same. Except for the time that Mrs. Ranke was away, Mr. Campion visited her practically every day, and he frequently played in her card games. The evidence does not disclose to what extent he counseled her in a business way prior to the year 1909, but it is undisputed that he was at that time her sole business and confidential adviser, although uncompensated, and that this relation continued until her death.

It is the contention of the respondent Campion that this corporation was organized at the request of Mrs. Ranke to relieve her of the care of the business. There is testimony in the record, however, that she regretted the organization of the corporation, as it prevented her from knowing the details of the business. It is undisputed, however, that, after the organization of the corporation, its entire management and control was in the hands of the respondent John T. Campion, so far as we have any record evidence. It is true that for a few years Mrs. Ranke kept items in the book we have referred to, but the actual business matters were all handled by Campion, and the securities, both of the corporation and those held by Mrs. Ranke personally, were under his personal control, and so completely was this the case that, at the time of the trial, among these securities was a $5,000 bond belonging to the son of respondent and which he had never taken the trouble to segregate from the other securities, but all were in a safe deposit box controlled by him.

The original issue of stock in this corporation was a certificate of 4,998 shares to Dora D. Ranke, a certificate for one share to respondent John T. Campion, and another certificate for one share to respondent Mamie Campion. Although there is something said in the testimony about these two latter shares

being paid for, no proof of payment was offered, and we think it sufficiently appears that these were merely qualifying shares belonging in fact to Mrs. Ranke, but issued to the shareholders named so they could act as the other two trustees of the corporation, Mrs. Ranke being the first trustee. The corporation was organized in February, 1909. On the first day of July a check was issued for $500 in favor of the respondent John T. Campion, which is entered on the account book as his June salary, and a like check was issued each month thereafter until January 1, 1915, when the amount was cut to $250, and the latter custom was followed up to the time of Mrs. Ranke's death. Each of these checks was immediately, upon being issued, either deposited to the personal credit of Dora D. Ranke, or Mr. Campion deposited to her credit his own check for the same amount. Respondent Campion alleged in his answer that this was issued to him as a salary for his services performed for the corporation but that he made a present of this salary to Mrs. Ranke, as well as the two dividends of $1,250 each, hereafter referred to, checks for which were originally drawn in his favor. The total of these sums aggregate about $46,000. Upon the trial he testified that he did not want to profit out of Mrs. Ranke's affairs and never had.

The fact is not disputed that the entire net income of the business of this corporation was received by Mrs. Ranke in the first instance, if we except the so-called dividend payments at the close of the years 1917 and 1918. According to Campion, shortly prior to Christmas of each of those years a dividend of one per cent was declared. The undisputed facts are that a check for $1,250 was issued directly to Dora D. Ranke, another for $1,250 to John T. Campion, which was immediately paid over to Mrs. Ranke, another one for $1,250 to respondent Mamie Campion, and the fourth

for $1,250 was, for the year 1917, issued to buy exchange in favor of appellant Gretchen Meyer. This draft was forwarded along with Christmas presents, and around the envelope containing the draft was a piece of tissue paper upon which was placed in the handwriting of Mrs. Campion, "Not to be opened until Christmas." Just prior to Christmas, 1918, a check for a similar amount was sent to Mrs. Meyer along with her Christmas presents, and other sums were disbursed in the same manner as in 1917. There was no communication with either check sent to Mrs. Meyer indicating that it had anything to do with stock or dividends.

We have outlined so much of the testimony as we deem essential for the consideration of the transaction which involves the subject of this litigation.

According to the respondents, on January 24, 1917, there was a meeting at the home of Mrs. Ranke, there being present only Mrs. Ranke and the two respondents. At this meeting the certificate for 4,998 shares theretofore issued to Mrs. Ranke was cancelled and four new certificates were issued, one for 1,250 shares in favor of Dora D. Ranke, one for 1,250 shares in favor of Gretchen Meyer, one for 1,249 shares in favor of John T. Campion, and one for 1,249 shares in favor of Mamie Campion. According to the respondents, this was done at the earnest request and solicitation of Mrs. Ranke.

The case of respondent John T. Campion rests upon the testimony of his wife, the respondent Mamie Campion. In her direct examination, in speaking of her mother, she testified: "She said she wanted him to have those shares and be sort of a balance wheel." This witness subsequently testified that, in a later conversation with her mother, the latter said she was glad she had given the stock to Mr. Campion; that he would

sort of prove a balance wheel because he could attend
to business and she and her sister were rather ignorant
of business affairs. She thought Mr. Campion was
capable of taking care of her affairs.

These new stock certificates were actually written
by John T. Campion and signed by him as vice-presi-
dent, and by his wife as secretary. The surrendered
certificate for 4,998 shares had been at all times in the
possession of John T. Campion, as well as were all
other stock certificates ever issued in this corporation
excepting the one in favor of Gretchen Meyer. This
last mentioned certificate was first shown to Mrs.
Meyer at the office of respondent Campion at the time
when she was visiting her mother in the summer of
1917, at which time Campion instructed her to sign
her name upon the back at a place which he had marked
with a cross, and he immediately took the certificate
and kept it until it was tendered to her after her
mother's funeral along with some bonds, which were
all returned to respondent Campion for safe keeping,
and these were all surrendered to the attorneys shortly
before the trial. According to Mrs. Meyer, Campion
stated to her at the 1917 interview that the stock had
been divided into four parts on account of excessive
income taxes. The surrendered certificate for 4,998
shares was cancelled in the handwriting of the respond-
ent John T. Campion and bears no endorsement ex-
cepting the name of Mamie Campion, which was placed
upon the certificate by mistake.

Following the death of her mother, appellant and
her husband came from Chicago to Seattle and, ac-
cording to her testimony, discovered for the first time
that respondent John T .Campion was claiming some
interest in these shares other than that of a mere trus-
tee. According to the testimony of Fred Meyer, the
husband of appellant, respondent Campion at this time

first stated that these 1,250 shares were in his name and for obvious reasons could not be immediately transferred, but that after about sixty days he would transfer them through the medium of the two grandchildren, Cyrus, son of the respondent, and Dorothea, the daughter of the appellant. Later on, according to the testimony of appellant and her husband, respondent Campion modified his position by saying that he would transfer the stock or some part of it. A short time later appellant returned to Chicago and employed the service of Mr. Creekmur, an attorney of that city, who came to Seattle with a power of attorney from appellant and went over the affairs of the corporation with respondent Campion. Mr. Creekmur made a careful examination of the minutes and made notes of the books of the corporation and of certain portions of his conversation with the respondent Campion with the full knowledge of the latter. According to Mr. Creekmur, Campion first said: "I did a lot for Mrs. Ranke. As to the quarter interest in the stock, I bought that and paid for it, and I began paying for it in July, 1909. I paid for it at the rate of $500 a month." After the witness had spent further time in going over matters, and upon a subsequent interview, he asked respondent Campion how it happened that he began the purchase of the stock on the installment plan and that he got it paid for just when Mrs. Ranke died. To which respondent answered: "Oh, I just thought of it that way." He further stated that he had had no talk with Mrs. Ranke about the purchase but just thought of it that way. Upon the witness suggesting that that would hardly constitute a purchase, respondent stated: "Well, she could have given it to me if she wanted to." And, upon being further interrogated, respondent told Creekmur that he had taken this stock

at the earnest request of Mrs. Ranke and upon condition that it was to be his absolutely.

Both the abstract of the testimony and the briefs in this case are voluminous, but we will content ourselves with citing only a portion of the authorities which we deem especially pertinent.

Respondents' case rests upon the testimony of each on behalf of the other, as it is admitted that each is disqualified from testifying in his and her own behalf. It is first contended by appellant that this evidence is not admissible because of the provisions of § 1211, Rem. Compiled Statutes, relative to testimony of transactions of deceased persons. The trial court admitted this testimony upon the authority of *Showalter v. Spangle,* 93 Wash. 326, 160 Pac. 1042. It is argued that the facts in this case distinguish it from the former case. We do not find it necessary to pass upon this question.

There are certain well-settled rules which are decisive of this case. We are satisfied, first: That the respondents have the burden of proof. It is admitted that a fiduciary relation existed. Respondents contend in their brief that the case must be treated under some of the five classifications which Mr. Pomeroy makes of fiduciary relations, viz.: Trustee and beneficiary, principal and agent, attorney and client, guardian and ward, parent and child, and discuss the case as if it fell either under that of parent and child or principal and agent. In our opinion, this case is not limited to either of these classifications. In § 955, Pomeroy's Equity Jurisprudence (4th ed.), the author says in part:

"The single circumstance now to be considered is the existence of some fiduciary relation, some relation of confidence subsisting between two parties. . . . Nor does undue influence form a necessary part of the

circumstances, except so far as undue influence, or rather the ability to exercise undue influence, is implied in the very conception of a fiduciary relation, in the position of superiority occupied by one of the parties over the other, contained in the very definition of that relation.''

And again in § 956:

''Courts of equity have carefully refrained from defining the particular instances of fiduciary relations in such a manner that other and perhaps new cases might be excluded. It is settled by an overwhelming weight of authority that the principle extends to every possible case in which a fiduciary relation exists *as a fact,* in which there is confidence reposed on one side, and the resulting superiority and influence on the other. The relation and the duties involved in it need not be legal; it may be moral, social, domestic, or merely personal.'' Pomeroy's Equity Jurisprudence (4th ed.), § 956.

The formal relationship in this case was that of mother-in-law and son-in-law. So far as the element of trust and confidence is concerned, it resembled that of parent and child. There was not, however, the element of blood relationship, which distinguishes this situation from that of parent and child and removes any presumption as to the probability of a gift of this magnitude.

Second: Mrs. Ranke had no independent advice, either before or after the claimed transaction, and while some authorities do not go as far as to hold a transaction of this kind void under all circumstances, we think there are none but what would hold it at least voidable and place upon the donee the burden of proof.

''The transaction is not necessarily voidable, it *may* be valid; but a presumption of its invalidity arises, which can only be overcome, if at all, by clear evidence of good faith, of full knowledge, and of independent consent and action. . . . The principle is applied

with great emphasis and rigor to gifts, whether they are simple bounties, or purport to be the effects of liberality based upon antecedent favors and obligations.'' Pomeroy's Equity Jurisprudence (4th ed.), § 957.

In the recent case of *Hemrich v. Hemrich,* 117 Wash. 124, 201 Pac. 10, we refused to sustain a gift from son to mother, and authorities in which the lack of independent advice was important are freely cited. The son was dead at the time of trial, but the transfer was clearly proven by a deed executed by the son.

While it is not necessary for us to adopt the principle of independent advice in all cases, the lack of it in this case seems to us a very important factor.   The beneficiary was a man skilled in business affairs and used to handling large transactions.   He was sensitive of his reputation for personal and business integrity, and if this transaction took place as claimed and it was intended to make an outright disposal of this stock, the natural thing for him to have done would have been to insist upon independent advice for Mrs. Ranke and for a formal contract evidencing the transaction and witnessed by third persons.   A man of his business experience would naturally know that the transfer of stock worth over $100,000 and comprising practically one-fourth of his mother-in-law's estate would not pass unquestioned unless the legality of the transfer was well established.   Even the testimony upon which he relies is not precise nor definite as to what took place at the time of the claimed transfer.   We cannot escape the conclusion that this transfer of stock of January 24, 1917, was intended as a mere temporary arrangement at the suggestion of respondent John T. Campion that it had something to do with relieving the burden of taxation.

Third: Another feature of the case which tells against the position of the respondent is that the documents under which he claims were entirely prepared by himself.

In *Ingram v. Wyatt*, 1 Hag. Ecc. Rep. 384, it is said:

"Where that relation of confidence exists, and where the party frames the instrument for his own advantage and benefit, every presumption arises against the transaction."

This was relative to the execution of a will. The rule as to gifts *inter vivos* is stricter:

"The controlling reason is, I think, because by a gift a man strips himself of that which he can still enjoy and of which he may have need during his life; while by his will he disposes of that which can be of no further use to him. As he is, under ordinary conditions, so much the less likely to do the first than the second, courts subject gifts to the sharper scrutiny." *In re Sparks' Will*, 63 N. J. Eq. (18 Dick.) 242, 51 Atl. 118.

In *Yardley v. Cuthbertson*, 108 Pa. St. 395, 1 Atl. 765, 56 Am. St. 218, it is said:

"It is almost unnecessary to add that this rule is a rule of general application to all kinds of instruments, the procurers of which are large beneficiaries by virtue of their operation. It is a rule of equity and is of very ancient origin. In its ordinary statement the fact of mental weakness in the grantor does not appear, and is not at all necessary to the application of the rule in a given case."

As instances of the application of the rule in cases involving gifts *inter vivos,* see: *Rickman v. Meier*, 213 Ill. 507, 72 N. E. 1121; *Smith v. Smith*, 84 Kan. 242, 114 Pac. 245, 35 L. R. A. (N. S.) 944.

It is true that Mrs. Ranke was paralyzed at that time and could not write with her right hand, but in a matter of this consequence she could either have writ-

ten with her left hand or made her mark, or authorized some independent person to sign her name. In addition to her interest in the certificate which was cancelled without any physical act on her part, she was president of the corporation and, as such, the proper person to sign stock certificates, particularly the one which respondent signed as vice-president and issued to himself.

Summarized, the case resolves itself in respondent husband claiming a gift of over $100,000 from a mother-in-law, who trusted him with the handling of practically all her property and who followed his advice in her business, made without independent advice, upon the production of testimony the written portion of which is prepared by himself and the oral portion of which is all interested; for it is idle to say that the wife is disinterested; granting that the gift became his separate property, outside of the natural loyalty she bears toward her husband she has the interest of prospective heirship, and what is immediately important, she will naturally expect to share in his augmented income.

Aside from the evidence which directly opposes respondent's contention, and only a portion of which we have recited, we reach the conclusion that respondents have not successfully met the burden the law imposes upon them and their defense must fail.

Whether the respondent Mamie Campion and appellant Gretchen Meyer continue to hold their certificates for 1,250 shares each does not change their position materially, as they are the only heirs of the estate; but with the view we take of this transaction, we think these shares should also be surrendered to the representatives of the estate as such.

The judgment will be reversed, with directions to enter judgment against the defendants for the sur-

render of the certificates of stock held by them for 1,250 shares each in the Ranke Investment Company, and that the executrices accept the surrender of the certificate for 1,250 shares tendered by the appellant.

PARKER, C. J., MAIN, HOLCOMB, and BRIDGES, JJ., concur.